**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 3 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MIMICS, INC., a Texas corporation;
RICHARD WILDGRUBE;
MARGARET WILDGRUBE,
individually,

        Plaintiffs-Appellees,

v.

THE VILLAGE OF ANGEL FIRE;
MARY FRANCES McKINLEY;
GARY STANSBURY,

        Defendants,

and

CHARLES HASFORD,

        Defendant-Appellant.

No. 03-2214

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-99-839-MV/ACT)**

---

Andrew S. Montgomery (Randy S. Bartell, Germaine R. Chappelle, with him on
the briefs), Montgomery & Andrews, P.A., Santa Fe, New Mexico, for Defendant-
Appellant.

Michael H. Schwarz, Santa Fe, New Mexico, for Plaintiffs-Appellees.

Before **MURPHY**, **ANDERSON**, and **HARTZ**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I.    INTRODUCTION

Plaintiffs-Appellees Richard Wildgrube, Margaret Wildgrube, and MIMICS, Inc. (hereinafter and collectively, the "Wildgrubes") brought this suit under 42 U.S.C. § 1983, alleging rights violations under the First, Fourth, and Fourteenth Amendments.  Defendant-Appellant Charles Hasford appeals the district court's denial of his motion for summary judgment premised on qualified immunity.  We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and **affirm** in part, **reverse** in part, and **remand** for further proceedings consistent with this opinion.

## II.    FACTS AND PROCEDURAL HISTORY[1]

When the events that gave rise to this lawsuit occurred, the Wildgrubes were residents of the Village of Angel Fire, New Mexico.  Angel Fire is located in northern New Mexico and has a population of approximately 1600.  The Wildgrubes own and operate MIMICS, Inc. ("MIMICS"), a Texas corporation

---

[1]The factual recitation is based on a consideration of the evidence in the light most favorable to the Wildgrubes, the parties against whom Hasford sought summary judgment.  *Verdecia v. Adams*, 327 F.3d 1171, 1174 (10th Cir. 2003).

licensed to do business in New Mexico. MIMICS is a computer software company that provides software to financial institutions nationwide. In or around June 1996, MIMICS moved into the Racquet Club Commons ("Commons") condominium complex in Angel Fire. The Wildgrubes' landlord at the Commons was Robert Morrow. Morrow told the Wildgrubes that the Village of Angel Fire's Planning and Zoning Commission had approved MIMICS to operate at the Commons without any waiver or variance. The Commons was zoned R-3, Residential-Multiple Family, which did not permit use for business purposes that are not ancillary to the permitted residential use.

Hasford was a resident of Angel Fire and during the relevant time period served as the Village building inspector. As building inspector, Hasford was also an *ex officio* member of the Planning and Zoning Commission. In addition, Hasford held a contractor's license and owned and operated Angel Fire Lock & Key. Hasford eventually resigned as building inspector, effective January 23, 1997, over questions about a possible conflict of interest arising from his possession of a contractor's license while simultaneously serving as building inspector.

In late 1996, Morrow became a Village councilor. Shortly thereafter two opposing political factions developed among the members of the Village Council. Morrow, who had been socially and politically allied with the Wildgrubes, was

politically opposed to two other members of the Village Council, Gary Stansbury and Mary Frances McKinley, who are also named as defendants in this action. Hasford was aligned with Councilors Stansbury and McKinley.

On December 20, 1996, Hasford entered and inspected the MIMICS property without permission from either the Wildgrubes or Morrow. Hasford's inspection was allegedly prompted by the observation of building materials outside the building. Hasford entered through a back door at approximately 5:30 p.m. without announcing his presence.[2] The door through which Hasford entered was typically kept locked. Mrs. Wildgrube testified that when she discovered Hasford in the MIMICS office, Hasford asked in a demanding voice, "What the hell is going on in here?" Mrs. Wildgrube directed Hasford to speak to either Mr. Morrow or Pete Wasilewski, the Commons building manager. Hasford indicated that he had observed construction that was not permitted. Mrs. Wildgrube testified that she was disturbed and frightened by Hasford's appearance and asked Hasford to leave several times, but Hasford continued looking around the premises. Mrs. Wildgrube stated that Hasford eventually responded by saying, "I don't care what Bob Morrow's position is in this town. I am going to report him

---

[2]All parties agree that in December it is dark in New Mexico at 5:30 p.m. and Hasford concedes that the inspection was conducted after business hours.

to the CID [Construction Industries Division ("CID")]." Hasford eventually exited through a different door from that which he entered.

On January 16, 1997, Hasford again entered MIMICS unannounced and without permission or a warrant. Mr. Wildgrube was in the office and walked around a corner almost running into Hasford. Mr. Wildgrube testified that he asked Hasford what he was doing and Hasford responded, "I want to see what's going on here!" The two men were standing nose-to-nose and Mr. Wildgrube described the situation as physically threatening. Mr. Wildgrube asked Hasford if he had spoken to Morrow and Hasford indicated that he had not. Mr. Wildgrube testified that he told Hasford he was uncomfortable with the situation but Hasford said, "I can come into any business in Angel Fire anytime I want to!" Mr. Wildgrube stated that Hasford then said if Mr. Wildgrube did not want him there he could ask Hasford to leave and that Hasford would then get a court order. Mr. Wildgrube testified that he asked Hasford to leave, at which time Hasford wrote something in his notebook and said, "That will be duly noted."

At no time was MIMICS open to the general public. There were no signs indicating the property was accessible to anyone but the occupants. All mail was received at the post office and all customer service was handled by telephone, modem, fax machine, or by visiting customers' places of operations.

After Hasford's first uninvited entry into MIMICS, the Wildgrubes spoke to Morrow. Morrow subsequently spoke to the Village Mayor about Hasford's conduct. In addition, at the December 12, 1996 and the January 9, 1997 Executive Sessions of the Village Council, Morrow raised the issue of Hasford holding a contractor's license while being Angel Fire's building inspector. Morrow also raised the issue of Hasford's conduct toward the Wildgrubes at the January 9 Executive Session. The Wildgrubes also complained about Hasford's conduct to Mayor Cottam, the Planning and Zoning Chairperson, and the Municipal League. Mrs. Wildgrube was contacted by the Sangre De Cristo Chronicle regarding Hasford's purported conflict of interest. The paper ran several stories regarding this conflict, one of which ran on January 16, 1997, the day of Hasford's second unannounced entrance into the MIMICS' office and a few days before Hasford's resignation became effective.

On January 17, 1997, the Chief Inspector of the New Mexico CID inspected MIMICS with the Wildgrubes' consent. Also present during this inspection were other CID officials, Hasford, Mayor Cottam, and the Planning and Zoning Commission Chairperson. During the inspection, the Wildgrubes protested Hasford's conduct to the CID officials. The Wildgrubes testified that CID officials told them that there were no problems with MIMICS' occupancy and no serious code violations.

Notwithstanding the statements of CID officials assuring the Wildgrubes that there were no problems with the property, on or about January 20, 1997, Hasford wrote a letter alleging that there were nine building code violations and submitted the letter to CID, the Angel Fire Village Council, and the Fire Marshal. At the Planning and Zoning Commission meeting of January 30, 1997, the Wildgrubes spoke out against what they felt was harassment directed toward them. Subsequently, on February 13, 1997, the occupation of MIMICS in the Commons was placed on the Planning and Zoning Commission agenda and the commissioners decided to permit MIMICS to remain on the property for six months.

The Wildgrubes filed suit under 42 U.S.C. § 1983 against the Village of Angel Fire, Hasford, McKinley, and Stansbury, alleging retaliation in violation of the First Amendment and deprivation of their substantive and procedural due process rights. The Wildgrubes also alleged violations of the New Mexico Tort Claims Act. The district court thereafter granted the Wildgrubes' motion for leave to file an amended complaint. In their First Amended Complaint, the Wildgrubes abandoned their substantive due process and state tort claims but sought money damages pursuant to 42 U.S.C. §§ 1983 and 1988 for Defendants' alleged violations of their First Amendment rights of free speech and free association, Fourth Amendment right to be free from unlawful searches, and

Fourteenth Amendment guarantees of equal protection and procedural due process.

The district court, *inter alia*, denied Hasford's motion for summary judgment based on a defense of qualified immunity from the Wildgrubes' First Amendment claim, Fourth Amendment claim, and Fourteenth Amendment equal protection claim. *MIMICS, Inc. v. Village of Angel Fire*, 277 F. Supp. 2d 1131, 1150, 1153, 1157 (D.N.M. 2003). It is that order which is the subject of this appeal.[3]

## III.  DISCUSSION

"Orders denying qualified immunity before trial are appealable to the extent they resolve abstract issues of law." *Foote v. Spiegel*, 118 F.3d 1416, 1422 (10th Cir. 1997). When, as here, "a defendant's appeal of the denial of a motion for summary judgment is based on the argument that, even under the plaintiff's version of the facts, the defendant did not violate clearly established law, then the district court's summary judgment ruling is immediately appealable." *Johnson v. Martin*, 195 F.3d 1208, 1214 (10th Cir. 1999).

---

[3]The district court also granted the Wildgrubes' motion for summary judgment against defendants Village of Angel Fire and Hasford on the Fourth Amendment claims. *MIMICS, Inc. v. Village of Angel Fire*, 277 F. Supp. 2d 1131, 1160-62 (D.N.M. 2003). Neither Hasford nor the Village of Angel Fire have appealed that portion of the district court order.

A denial of qualified immunity on summary judgment is reviewed *de novo*, viewing the evidence in the light most favorable to the nonmoving party. *Verdecia v. Adams*, 327 F.3d 1171, 1174 (10th Cir. 2003). To prevail on summary judgment against a defendant who asserts a defense of qualified immunity, a "plaintiff must show that (1) the official violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established when the alleged violation occurred." *Id*. The court must first determine if a constitutional right was violated because "[i]n the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Requiring the law to be clearly established provides defendants with "fair warning" that their conduct is unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002). "The law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains." *Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003). To be clearly established,

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citation omitted).

Usually, if the law was clearly established at the time of the relevant events, the qualified immunity defense will fail. *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). "Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained." *Id.* at 819. Exceptional circumstances which may render an official's conduct objectively reasonable and therefore justify qualified immunity include reliance on a state statute or regulation, *Roska*, 328 F.3d at 1248, 1251, and reliance on the advice of legal counsel, *V-1 Oil Co. v. Wyo. Dep't of Envtl. Quality*, 902 F.2d 1482, 1488 (10th Cir. 1990). It is the defendant's burden to claim such extraordinary circumstances and prove that his conduct was objectively reasonable. *Roska*, 328 F.3d at 1251.

**A. Fourth Amendment Claim**

The Wildgrubes allege that Hasford's entry onto their property on December 20, 1996 and then again on January 16, 1997 violated their Fourth Amendment rights.

*1. Constitutional Violation*

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. A search subject to Fourth Amendment protection occurs "when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001). "[E]xcept in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara v. Municipal Court*, 387 U.S. 523, 528-29 (1967).

Individuals have a reasonable expectation of privacy in commercial property. *United States v. Bute*, 43 F.3d 531, 536 (10th Cir. 1994). The circumstances of the particular commercial property dictate the level of an individual's expectation of privacy. As a consequence, a broad invitation to the general public would result in a lesser expectation of privacy compared to the expectation of privacy associated with a commercial property closed to the general public. *Id.* at 536-37.

The Wildgrubes have demonstrated a reasonable expectation of privacy in their property. The MIMICS office was not open to the public. All customer interaction was conducted by phone, modem, email, fax, or by visiting a customer

-11-

at its office. There were no signs at the MIMICS office that indicated it was open to the general public. In addition, MIMICS' mail was delivered to the post office.

Hasford, relying on this court's decision in *Artes-Roy v. City of Aspen*, argues that no search occurred and even if there was an unreasonable search any violation of the Fourth Amendment was *de minimis*. 31 F.3d 958, 962-63 (10th Cir. 1994). In *Artes-Roy* a building inspector who had previously issued a stop work order when the plaintiff did not comply with the building code, observed continuing construction activity at the plaintiff's home in violation of the outstanding order. *Id.* at 960. The inspector and his supervisor went to the plaintiff's home where they informed the construction workers on the roof that they were in violation of the work order. *Id.* The inspector pushed open the door of the plaintiff's home and stepped into the entryway without consent from the plaintiff. *Id.* at 962. Before the inspector's entry, the plaintiff and her husband had previously been in communication with him regarding the status of the construction. *Id.* at 960. The court concluded no search occurred because the defendant was "not on the premises to inspect for a violation of the building code; [he and the inspector] had already seen what they considered violations of the stop work order, from outside the premises." *Id.* at 962. The court alternatively held that even if the entry was considered a Fourth Amendment violation, it was *de minimis*. *Id.* at 962-63.

The rationale given by the court in *Artes-Roy* belies Hasford's suggestion that the case should be the basis for granting his motion for summary judgment. The court in *Artes-Roy* said that "[a] different rule [i.e., concluding the defendant's entry onto plaintiff's property was a search in violation of the Fourth Amendment] would subject to liability every public official who inadvertently, or by invitation of an unauthorized person, steps inside the door of a private residence." *Id.* at 962.

There is evidence in this case that Hasford's entries were intentional, uninvited, and in furtherance of an inspection. As the district court noted:

> Hasford's nonconsensual entry did not take the form of simply stepping into an open door when Plaintiffs were not looking or opening a door after having spoken with Plaintiffs, and standing in the entryway for a few minutes. It is undisputed that on both occasions in question, Hasford sought entry to examine the interior of the premises and not, as in *Artes-Roy*, to discuss his observations with anyone who might be present.

*Mimics, Inc.*, 277 F. Supp. 2d at 1155. Hasford's conduct may have far exceeded that of the defendant in *Artes-Roy*. There is evidence that on December 20, 1996, after working hours at approximately 5:30 p.m., Hasford entered MIMICS without permission through a back door. Mrs. Wildgrube testified that Hasford did not announce his presence and that she found Hasford "sneaking around." Mrs. Wildgrube also testified that Hasford continued looking around after she told him to leave and exited through a different door than the door through which he

-13-

entered thus allowing a more thorough search.  On January 16, 1997, there is evidence that Hasford again entered MIMICS without permission and without a warrant and was discovered by Mr. Wildgrube "snooping around" the office.

Hasford argues though that, like the officials in *Artes-Roy*, he did not enter the property with the purpose of conducting a search and thus no search occurred. He supports this assertion by arguing that "he had reason to believe that a building code violation was occurring."  Unlike the situation in *Artes-Roy*, however, Hasford did not have previous communications with the Wildgrubes regarding the construction and there was no outstanding stop work order. Hasford's suggestion that he entered the building because he noticed potential building code violations would indicate that he entered the property with the purpose of conducting a search.  Even Hasford later stated that "he intended to investigate whether Mr. Morrow should have obtained a building permit, whether he had violated other building code requirements, and whether a stop work order should be issued."  Moreover, evidence of Hasford's behavior indicates that he was conducting inspections of the property.

Hasford also argues that he believed the property was vacant thus he "could not possibly have entered with the purpose of searching" it.  Based on the evidence presented by the Wildgrubes, a reasonable factfinder could determine

-14-

that Hasford's alleged belief that the property was vacant at the time of the first entry was unreasonable.[4]

With regard to the second entry on January 16, 1997, Hasford contends he was simply seeking consent to investigate. There is evidence, however, from which a jury could infer the purpose for his second entry was to inspect and not to acquire consent.

Having concluded that there is evidence that Hasford's entries into MIMICS were more than *de minimis* searches under the Fourth Amendment, the remaining inquiry is whether there is evidence the searches were unreasonable so as to constitute Fourth Amendment violations. "It is well-established that a warrantless search is presumptively unreasonable under the Fourth Amendment and therefore invalid unless it falls within a specific exception to the warrant requirement." *Roska*, 328 F.3d at 1240; *see also Camara*, 387 U.S. at 529. Although Hasford uses the words "special need," we do not read Hasford's argument as suggesting the special needs exception applies.

---

[4]Hasford says that part of the reason he stopped to investigate on December 20, despite his alleged belief that the building was vacant, was because there was a newly built deck located on the outside of the building. Hasford had attended the Planning and Zoning Commission meeting in May 1996 during which the presence of MIMICS in the Commons was discussed. Hasford also inspected a water leak at the Commons in early autumn 1996 when MIMICS was occupying the premises. Based on the foregoing, a factfinder could determine it was unreasonable for Hasford to believe that the property was vacant on December 20, 1996.

Hasford does suggest that balancing the important government interest in safe construction against any individual harm from government intrusion justifies as reasonable brief, unauthorized investigative entries like the ones he conducted. New Mexico's interest in safeguarding the well-being of the public by prohibiting unsafe construction does not necessarily equate with a need for nonconsensual, warrantless, investigative entries. *Cf. Donovan*, 452 U.S. at 600 ("a warrant may not be constitutionally required when Congress has reasonably determined that warrantless searches are necessary to further a regulatory scheme"). The very statutes upon which Hasford relies to support his claim of an important government interest in construction safety suggest otherwise. The New Mexico Building Code, incorporated by reference into the Village of Angel Fire Ordinance, specifies that inspections should be attempted during reasonable hours, presumably so that the owners/occupiers will be present and consent can be sought. 1991 N.M. Bldg. Code § 202(a), CID-GCB-NMBC-91-1. In the absence of consent, "the inspector shall proceed to obtain a search warrant." *Id.* Based on this statutory scheme it is clear that New Mexico has recognized that it does not have a need for nonconsensual, warrantless, administrative entries. Thus, the very statutes upon which Hasford relies do not support his argument.

As the district court noted, the Supreme Court has expressly held that "administrative entry, without consent, upon the portions of commercial premises

-16-

which are not open to the public may only be compelled through prosecution or physical force within the framework of a warrant procedure." *See v. City of Seattle*, 387 U.S. 541, 545 (1967). Hasford did not have consent to enter MIMICS on December 20, 1996, made no attempt to seek consent before entering, and allegedly continued inspecting the property after being told to leave. Having been told to leave the premises once before, Mr. Wildgrube testified that Hasford again entered MIMICS without permission on January 16, 1997, and told Mr. Wildgrube, "I want to see what's going on in here." Construing the evidence in the Wildgrubes' favor, as we must do on summary judgment, Hasford has failed, at least at this point in the proceedings, to establish that he is entitled to qualified immunity on the Wildgrubes' Fourth Amendment claim.

*2. Clearly Established Law*

Hasford is challenging the district court's conclusion that the Wildgrubes satisfied their burden of showing that he violated their clearly established rights under the Fourth Amendment. Hasford does not dispute that, as a general matter, it is clearly established that commercial property owners have some protection under the Fourth Amendment. *See id.* Hasford, however, contends that under *Artes-Roy* it was clearly established that his entries into MIMICS did not violate the Fourth Amendment or were at most *de minimis* violations. No reasonable person, however, could conclude that Hasford's conduct as described by the

Wildgrubes was authorized by the holding of *Artes-Roy*. In *Artes-Roy*, the plaintiff saw the inspectors coming, the intrusion was minimal with the inspectors standing approximately a foot inside the entryway, and the inspectors had already seen the violations from outside the premises and thus had no intention of investigating the interior of the property. 31 F.3d at 962. In contrast, there is evidence that Hasford first entered MIMICS through a back door, after working hours, without permission, and without announcing his presence. Mrs. Wildgrube testified that after a confrontation with Hasford in which she told him to leave, Hasford exited through a different door from that which he entered. A few weeks later, Mr. Wildgrube testified that Hasford again entered MIMICS unannounced and without permission or a warrant. Accepting the Wildgrubes' testimony as true, Hasford has failed to establish that he is entitled to qualified immunity on the Wildgrubes' Fourth Amendment claim.

### 3. Exceptional Circumstances

Ordinarily, when the law is clearly established the qualified immunity defense will fail unless the defendant demonstrates "extraordinary circumstances . . . such that defendant was so prevented from knowing that his actions were unconstitutional that he should not be imputed with knowledge of an admittedly clearly established right." *Cannon v. City & County of Denver*, 998 F.2d 867, 871 (10th Cir. 1993) (quotations omitted); *see also Harlow*, 457 U.S. at 818-19; *V-1*

*Oil*, 902 F.2d at 1488. Reliance on a statute "that explicitly sanctioned the conduct in question" can be just such an extraordinary circumstance. *Roska*, 328 F.3d at 1251.

Hasford argues that, even if his conduct violated the Wildgrubes' clearly established rights, he is entitled to qualified immunity because he relied on the relevant New Mexico laws and regulations and the Village of Angel Fire ordinance. Under the New Mexico Construction Industries Licensing Act, "[a] state certified inspector may, during reasonable hours, enter any building or go upon any premises in the discharge of his official duties for the purpose of making an inspection of work performed . . . ." N.M. Stat. Ann. § 60-13-42 (2004) (repeal effective July 1, 2006). At the time, the New Mexico Building Code provided:

> If the owner or occupier of any building, premise or portion thereof refuses to allow an inspector to enter the building, premises or portion thereof at reasonable hours in the discharge of the duties imposed upon the inspector by this code, the inspector shall proceed to obtain a search warrant from a municipal magistrate upon oath or affirmation.

1991 N.M. Bldg. Code § 202(a), CID-GCB-NMBC-91-1. The relevant local ordinance states:

> The building or construction of any new building and structures within the municipal boundaries of the Village of Angel Fire, including new construction, additions, alterations or repairs, shall comply with all the requirements of the Uniform Building Code . . . and with the New Mexico Building Code . . . . It shall be the duty of

the Building Inspector to examine all applications for building permits and to inspect at such intervals as he or she deems appropriate, all ongoing construction within the Village of Angel Fire in order to ascertain compliance with the building codes and all other applicable ordinances and laws. For this purpose, the Building Inspector shall have the power to seek inspection of any property or structure at reasonable hours to determine compliance.

Village of Angel Fire, N.M., Ordinance No. 1990-03.

Reliance on a statute does not make an official's conduct *per se* reasonable. *Roska*, 328 F.3d at 1252. It is, however, "one factor to consider in determining whether the officer's actions were objectively reasonable, keeping in mind that the overarching inquiry is one of fair notice." *Id.* at 1253 (citation and quotation omitted). Determining whether reliance on a statute makes an official's conduct objectively reasonable, despite violating the plaintiff's clearly established rights, depends on "(1) the degree of specificity with which the statute authorized the conduct in question; (2) whether the officer in fact complied with the statute; (3) whether the statute has fallen into desuetude; and (4) whether the officer could have reasonably concluded that the statute was constitutional." *Id.* (footnotes omitted).

Reliance on a statute or regulation will not make an official's conduct objectively reasonable if the statute or regulation is obviously unconstitutional or if the officer "unlawfully enforces [such] ordinance in a particularly egregious manner, or in a manner which a reasonable officer would recognize exceeds the

-20-

bounds of the ordinance." *Grossman v. City of Portland*, 33 F.3d 1200, 1209-10 (9th Cir. 1994); *Roska*, 328 F.3d at 1253. To the extent Hasford is interpreting the Village ordinance and New Mexico statutes to permit nonconsensual warrantless entries at any time and under any circumstance, his understanding is not objectively reasonable. It has long been the rule that such warrantless nonconsensual entries into commercial property not open to the public violate the Fourth Amendment. *See See*, 387 U.S. at 545.

More importantly, Hasford's reliance on the statue and regulations does not make his conduct objectively reasonable because there is evidence that Hasford did not comply with the terms of the statute and regulations. *See Roska* 328 F.3d at 1253. There is evidence the first entry on December 20, 1996 was not conducted during reasonable hours as required by the Village ordinance and by New Mexico statute. Hasford himself concedes that his visit was "after hours." This is no trivial concern; the reasonable business hours requirement is necessary so that the owner/occupier is present and the inspector can seek consent. Mrs. Wildgrube testified that Hasford entered MIMICS after reasonable business hours, did not knock or announce his presence, entered by the back door, and was discovered snooping around the office, suggesting that he was *not* there to seek consent, but was actually conducting an inspection in violation of the statute and regulations. The second entry on January 16, 1997 was conducted after the

-21-

Wildgrubes had previously refused Hasford entry. Under the statutory authority upon which Hasford purportedly relied, he was required to seek a warrant to remain in compliance with the Fourth Amendment. 1991 N.M. Bldg. Code § 202(a), CID-GCB-NMBC-91-1.

## B. First Amendment Claim

The Wildgrubes allege that Hasford's conduct was in retaliation for their constitutionally protected speech regarding Hasford and their protected political association with Morrow.

### 1. Constitutional Violation

"An act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990) (quotation omitted). A First Amendment retaliation claim such as this requires proof

> (1) that the plaintiff was engaged in constitutionally protected
> activity; (2) that the defendant's actions caused the plaintiff to suffer
> an injury that would chill a person of ordinary firmness from
> continuing to engage in that activity; and (3) that the defendant's
> adverse action was substantially motivated as a response to the
> plaintiff's exercise of constitutionally protected conduct.

*Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (quotations omitted). On appeal Hasford does not contest that the Wildgrubes engaged in constitutionally protected conduct. Although not explicitly disclaimed, Hasford also makes no

argument challenging the second of the elements above. The focus is solely on the district court's conclusion that Hasford's actions were "substantially motivated" by the Wildgrubes' constitutionally protected conduct.[5]

"[P]roof of an official's retaliatory intent rarely will be supported by direct evidence of such intent." *Poole v. County of Otero*, 271 F.3d 955, 962 (10th Cir. 2001) (quotation omitted). In the context of a summary judgment motion on a qualified immunity defense to a claim involving the defendant's state of mind, the defendant must first show that the challenged conduct was objectively reasonable. *Gehl Group v. Koby*, 63 F.3d 1528, 1535 (10th Cir. 1995), *implicitly overruled on another issue by Currier v. Doran*, 242 F.3d 905, 916 (10th Cir. 2001). Because this court has determined that there is evidence Hasford's entries into MIMICS on December 20, 1996 and January 16, 1997 were not objectively reasonable, we need not conduct any further analysis.[6] Construing the evidence in the

---

[5]The Wildgrubes alleged that Hasford's December 1996 and January 1997 entries into MIMICS along with Hasford's February 1997 meeting with New Mexico CID officials, Stansbury, and McKinley formed the basis of the retaliation claim. *MIMICS, Inc.*, 277 F. Supp. 2d at 1146. The district court, however, rejected the Wildgrubes' argument that the meeting in February was retaliatory because Hasford put forward an objectively reasonable explanation for the meeting and the Wildgrubes failed to show that the meeting was motived by animus. *Id.* at 1146, 1149. The Wildgrubes do not challenge the district court's decision regarding the February 1997 meeting. This court will therefore address only the December 1996 and January 1997 entries as the bases for the First Amendment retaliation claim.

[6]Hasford acknowledges that the focus of his appeal is his assertion that his conduct was objectively reasonable for purposes of the First and Fourth

-23-

Wildgrubes' favor, as we must do on summary judgment, Hasford has failed, at least at this point in the proceedings, to establish that he is entitled to qualified immunity on the Wildgrubes' First Amendment claim.

*2. Clearly Established Law*

It has long been clearly established that the First Amendment bars retaliation for protected speech and association. *See Crawford-El v. Britton*, 523 U.S. 574, 592 (1998); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968) (concluding that public school employee may not be terminated because of exercise of employee's First Amendment rights). Hasford's conduct was motivated by a desire to retaliate against activity protected by the First Amendment. It would not be reasonable for a person acting as it is asserted Hasford did to believe that such conduct did not infringe upon the Wildgrubes' First Amendment rights.

**C. Fourteenth Amendment Equal Protection Claim**

The Wildgrubes charge that Hasford acted "arbitrarily, capriciously, in spite, ill will, and with a malignant animosity." The Wildgrubes claim they were "singled out and not treated like other similarly situated businesses" in the Village of Angel Fire.[7]

_____

Amendments.

[7]The conduct that forms the basis of the equal protection claim involved Hasford's two entries into MIMICS and Hasford reporting possible building code

-24-

*1. Constitutional Violation*

The Wildgrubes do not allege as part of their equal protection claim that they are part of an identifiable group.  The Supreme Court, however, has recognized equal protection claims brought by a "class of one, where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (quotation omitted).  To succeed on such an equal protection claim, the Wildgrubes must prove that they were "singled out for persecution due to some animosity," meaning that the actions of Hasford were a "spiteful effort to 'get' [the Wildgrubes] for reasons wholly unrelated to any legitimate state activity." *Bartell v. Aurora Public Schools*, 263 F.3d 1143, 1149 (10th Cir. 2001) (quotation omitted).  In addition, the Wildgrubes must prove that they were treated differently than those similarly situated.  *Id.*

Viewing the evidence in the light most favorable to the Wildgrubes, they have established an equal protection violation sufficient to preclude summary judgment in favor of Hasford based on qualified immunity.  The Wildgrubes have provided extensive testimony demonstrating that they were treated differently than others who were similarly situated.  Linda Libbey, the Chairperson and later

violations to New Mexico state authorities.

-25-

Director of the Planning and Zoning Commission, stated that she had "knowledge of businesses similarly situated to MIMICS that were treated differently." Libbey further provided a chart detailing the treatment of various businesses which demonstrates the differential treatment of MIMICS.

More importantly, the Wildgrubes' descriptions of Hasford's conduct and other evidence of his behavior indicate that Hasford was conducting a "campaign of official harassment directed against [the Wildgrubes] out of sheer malice." *Id.* (quotation omitted). Both Mr. and Mrs. Wildgrube describe angry confrontations with Hasford during the inspections. The selective targeting of MIMICS is arguably the direct result of the Wildgrubes' support of a political faction on the Village Council. Having determined that there is evidence that the entries by Hasford were objectively unreasonable, we view Hasford's reporting of MIMICS' potential code violations to government officials as part of his overall conduct. At this stage of the litigation, the Wildgrubes have thus presented sufficient evidence that the whole of Hasford's conduct was motivated by political spite and that the Wildgrubes were treated differently than others similarly situated.

*2. Clearly Established Law*

The district court concluded that there was "no doubt that Plaintiffs' rights to equal protection were clearly established well before Hasford's conduct took place." *MIMICS, Inc.*, 277 F. Supp. 2d at 1153. A few days after the initial entry

into MIMICS by Hasford on December 20, 1996, however, this court held that state officials had qualified immunity against an equal protection claim "where the plaintiff alleges that he is an individual victim of purposeful discrimination," but not part of a suspect class, because it "is not well enough established to hold the individual defendants to knowledge of it." *Norton v. Village of Corrales*, 103 F.3d 928, 933-34 (10th Cir. 1996). In so ruling, the court pointed to the failure of the plaintiffs to supply any case law establishing their equal protection theory and indicated that the court itself "found no authoritative opinion in this circuit on this issue." *Id.* at 934.[8]

The purpose of requiring the law to be clearly established in qualified immunity determinations is so state officials have fair notice that their conduct is unconstitutional. *Hope*, 536 U.S. at 739-40; *see also Lintz v. Skipski*, 25 F.3d 304, 305-06 (6th Cir. 1994) (noting that "defendants are not usually lawyers and they do not have familiarity with the contents of the Federal Reporter" so the question of when the law becomes clearly established "is one of fairness in light

---

[8]In *Village of Willowbrook v. Olech*, the Supreme Court definitively established the availability of an equal protection claim brought by a "class of one." 528 U.S. 562, 564 (2000) (per curiam) ("Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."). Subsequent to that decision, this court explicitly spelled out the elements of a "class of one" equal protection claim. *Bartell v. Aurora Public Schools*, 263 F.3d 1143, 1148-49 (10th Cir. 2001).

of all the facts"). Because *Norton* held that the specific type of equal protection claim advanced by the Wildgrubes was not clearly established at the time of Hasford's first entry into MIMICS, Hasford is entitled to qualified immunity as to the first entry. Moreover, because *Norton* failed to conduct an analysis of whether an equal protection violation occurred in that case, it would be equally unfair to deny Hasford qualified immunity for his conduct that occurred soon after that decision. Therefore, Hasford is entitled to qualified immunity on the Wildgrubes' equal protection claim and the district court's decision holding to the contrary is reversed.

## IV. CONCLUSION

For the reasons articulated above, this court **AFFIRMS** in part and **REVERSES** in part the district court's summary judgment order on qualified immunity and **REMANDS** the case to the district court for further proceedings consistent with this opinion.