FILED
United States Court of Appeals
Tenth Circuit

June 11, 2010

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

MICHAEL LEE STROPE, a/k/a
Gordon Eugene Strope,

   Plaintiff-Appellant,

v.

DAVID R. MCKUNE, Warden,
Lansing Correctional Facility, in his
individual capacity; COLLETTE
WINKLEBAUER, Deputy Warden,
Lansing Correctional Facility, in her
individual capacity; DREW
ROHLMAN, Kitchen Manager,
Lansing Correctional Facility, in his
individual capacity; MARY SASS,
Correctional Officer, Lansing
Correctional Facility, in her individual
capacity,

   Defendants-Appellees.

No. 09-3283
(D.C. No. 5:05-CV-03464-SAC)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **McKAY**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **EBEL**,
Circuit Judge.

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is
therefore ordered submitted without oral argument. This order and judgment is
not binding precedent, except under the doctrines of law of the case, res judicata,
and collateral estoppel. It may be cited, however, for its persuasive value
consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Plaintiff Michael Lee Strope appeals from the grant of summary judgment to defendants in this prison civil rights action brought over conditions at the Lansing Correctional Facility (LCF) in Kansas, pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § § 2000cc to 2000cc-5. Although his pleadings included additional matters, he now seeks review only with respect to his claims for (1) denial of heat during a cold period in late fall 2005; (2) retaliatory termination from a paid position at the prison laundry; and (3) interference with access to religious services and a proper and balanced kosher diet. We affirm the grant of summary judgment for the reasons explained below.

> We review the grant of summary judgment de novo, applying the same standard the district court should apply under Fed. R. Civ. P. 56(c). For dispositive issues on which the plaintiff will bear the burden of proof at trial, he must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment. Evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise. Unsubstantiated allegations carry no probative weight in summary judgment proceedings.

*Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) (quotations, citations, and alterations omitted). While we liberally construe the pleadings of the pro se plaintiff, "we do not act as his advocate." *Id.* "Thus, although we make some allowances for [his] failure to cite proper legal authority, his confusion of various

legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements, the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (quotation, citation, and alterations omitted).

### Inadequate Protection from Cold Temperatures

Mr. Strope submitted grievances on October 25 and 26, 2005, complaining of the lack of heat in the cell houses. R. vol. 1 at 108-13. He also pointed out that "no long johns ha[d] been furnished." *Id.* at 112. The warden responded:

> I cannot afford to turn on the heat until it appears that it is going to be consistently cool. Once we turn on the heat there's no turning it off until the temperature is consistently warm. Heating bills are predicted to be higher than ever this year and if the heat is turned on too early we will be wasting our tightly budgeted resources.
>
> I understand that every inmate has been issued two blankets.

*Id.* at 113. The heat was turned on in the cell houses two weeks later, between November 8 and 10. R. vol. 2, doc. 24, at 3.

The district court held as a matter of law that the conditions complained of "did not cause a denial of minimal necessities" and hence did not rise to the level of an Eighth Amendment violation. R. vol. 3 at 172. In support of its conclusion, the court cited official climate data for the region reflecting an "overall average temperature approximately 60° during the month [of October]," as well as the "uncontested [fact] that prisoners were provided extra blankets." *Id.* We agree

-3-

with the court's conclusion, though we consider the relevant climate data somewhat differently.

First of all, the relevant time period should not include the entire month of October and exclude all of November. Mr. Strope's complaints arose with dropping temperatures in the latter part of October and the heat was not fully turned on until November 10. Using an average temperature that reaches back to earlier, warmer days in October obviously skews the data. We should focus, rather, on temperatures between October 25 and November 10, when the average daily temperature was five degrees less than the 58.5 degrees noted by the district court (which it rounded up to 60 degrees).[1] Second, using average daily temperature is misleading, in that warm daytime temperatures offset and obscure the colder temperatures at night, when inmates are also inactive. The nighttime average for the relevant period was approximately 40 degrees. And use of an average in itself can have an obscuring effect, erasing any trend toward colder temperatures. Here, however, the temperature stayed fairly constant into early November, with a sharp drop only on the 9th and 10th, when the prison was in the process of turning on the heat. Finally, these are outside temperatures, which are obviously of limited relevance. But Strope also complained that the buildings'

---

[1] The figures cited above are drawn from the October 2005 data submitted by defendants, augmented with November data reported from the same official source (the National Climatic Date Center).

windows were not covered, R. vol. 1 at 112, so the cited temperatures may not have exaggerated too much the conditions for inmates in their cells.

Of course, temperature per se does not tell the whole story. "[T]he cases suggest that courts should examine several factors in assessing claims based on low cell temperature, such as the severity of the cold; its duration; whether the prisoner has alternative means to protect himself from the cold; [and] the adequacy of such alternatives." *Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997). Thus, in *Mitchell v. Maynard*, 80 F.3d 1433 (10th Cir. 1996), we found an actionable Eighth Amendment claim by a prisoner who, among other things, "was stripped of his clothing, placed in a concrete cell, with no heat at a time when nighttime temperatures hovered in the mid-fifties, [and] provided no mattress, blankets or bedding of any kind," where such conditions could have "lasted for a period of days, weeks and months." *Id.* at 1442; *see also id.* at 1443 ("In particular we are troubled by the lack of heat combined with the lack of clothing and bedding [along with other conditions].").

Here, the surrounding circumstances generally undercut, rather than bolster, Mr. Strope's Eighth Amendment claim. While his grievance notes the lack of long underwear, there is no evidence indicating inmates could not wear clothing sufficient to keep warm. Nor did Strope controvert the warden's statement that inmates had been issued an extra blanket. Finally, the time period involved was

just above two weeks, with the most drastic drop in temperature occurring over the last two days as the heat was being turned on.

Although we believe relevant outside temperatures were colder than what was suggested by defendants' summary of the climate data, taking into account all of the circumstances, we still agree with the district court that Strope's claim must fail. "The Eighth Amendment 'does not mandate comfortable prisons,' and conditions imposed may be 'restrictive and even harsh.'" *Barney v. Pulsipher*, 143 F.3d 1299, 1311 (10th Cir. 1998) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981)). "[A] prisoner must show that conditions were more than uncomfortable, and indeed rose to the level of 'conditions posing a substantial risk of serious harm to inmate health or safety.'" *DeSpain v. Uphoff*, 264 F.3d 965, 973 (10th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). In short, "extreme deprivations are required," *Hudson v. McMillian*, 503 U.S. 1, 9 (1992); only those denying "the minimal civilized measure of life's necessities" are grave enough to give rise to an actionable violation of the Eighth Amendment, *id.* (quotation omitted). Here, Strope has shown only that he had to endure a temporary period of inconvenience, perhaps even some discomfort (though he did not describe any discomfort), while the warden waited for weather conditions to warrant turning on the heat. On our record, a reasonable jury could not find that conditions were severe enough to qualify as an Eighth Amendment violation under the governing standards.

## Retaliatory Termination from Laundry Job

Mr. Strope alleged that the supervisor of the prison laundry, defendant Mary Sass, terminated him from his job as a laundry porter on March 30, 2005, in retaliation for engaging in protected First Amendment activity.[2]  For the protected activity, he relies primarily on a letter to the Governor complaining about Sass that he claims to have mailed the morning he was allegedly fired, though he also refers to a complaint about Sass that he claims to have submitted a month earlier to the deputy warden for support services, defendant Collette Winklebauer (who denied receiving this complaint).[3]  Defendants noted that Strope had not produced a copy of either document, and argued they were entitled to summary judgment based on his failure to show that Sass knew the documents existed and retaliated against him for having voiced the complaints they made against her.  The district court agreed.

Actually, the facts of the matter are more complicated than defendants' broad-brushed characterization of the record would make it appear, at least as to

---

[2]     Strope also complained that Sass ordered the laundry shaken down after he left, allegedly exposing him to retaliation from other laundry workers.  Not only did Sass aver that she "did not ask for a search (shakedown) of the laundry at that time," R. vol. 3 at 79, but prison officials explained that "[t]he shakedown team routinely checks the laundry for contraband and you had nothing to do with their shakedown, this was scheduled previous to your allegations."  Id. at 145, 154.  As Strope offered nothing to effectively oppose this evidence, we do not address this secondary aspect of his claim any further.

[3]     Strope alludes to a third complaint, made in December 2004, as well, but it did not concern Sass.

the complaint addressed to the Governor. Strope submitted into evidence a postal receipt dated March 30, 2005, signed by a prison unit team member, for a certified letter to the Governor, which indicated it was a "6 pg. Legal complaint on work [e]nvironment/condition." R. vol. 3 at 143. Circumstances related by Strope in his grievances over his removal from the laundry depict Sass' prompt discovery of this complaint. He explained that shortly after he submitted the letter for certified mailing, he returned to work and "Sass went crazy on him, hung [up] the phone, and demanded if [he] had a complaint on her." R. vol. 3 at 152; *see also* R. vol. 1 at 138. He stated that "when [he] tried to respond with a yes and I feel . . .," he "was cutoff [and] told to go lay in and get out of her laundry." R. vol. 3 at 152; *see also* R. vol. 1 at 138. This version of events, while certainly disputed by defendants, belies their contention that there was no evidence at all to suggest that Sass knew of any of the complaints that Strope alleges prompted his termination. Indeed, Sass makes no such representation of ignorance in her affidavit. *See* R. vol. 3 at 78-79.

Of course, that just requires us to proceed further with the inquiry into the reasons for Strope's removal from the laundry; it does not end the inquiry. In her response to Strope's grievances, Winklebauer explained that his removal was for a very different reason that did not evidence any retaliatory motive:

> Ms. Winkelbauer was aware that you approached Ms. Sass and told
> her that you did not feel comfortable working in the laundry.
> Ms. Sass, in the presence of COI Clary did lay you in and asked the

> UTM to unassign you from the laundry because of your concern.
> You were removed from the laundry administratively because of your
> statement. Ms. Sass was looking out for your welfare.

*Id.* at 147; *see also id.* at 145. Sass' affidavit confirms this account, noting

Strope asked to be laid in from his laundry job because he felt unsafe and that this

was why she did not file a disciplinary report against him, which would have been

required had she fired him. *Id.* at 78-79. Moreover, complaints made by Strope

himself, about the danger he perceived himself to be in from black inmates

working in the laundry, add support for the account provided by Sass and

Winklebauer. *Id.* at 150-51 (complaining that Sass staffed the laundry in such a

way as to "create[] a hostile racial work area that placed white inmates in danger"

and recounting an incident in which a violent threat against another white inmate

became potentially directed toward him). And, given the overarching obligation

of prison officials to protect inmates from known threats, this stated explanation

for removing Strope from the laundry carries a great deal of inherent force.

A prisoner claiming retaliation for exercising First Amendment rights must

show that a retaliatory motive was the but-for cause of the challenged adverse

action. *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998). Thus, to

defeat summary judgment, Strope had to demonstrate a triable issue not only that

retaliation for the complaint he addressed to the Governor played a role in his

removal from the laundry but that such retaliation was the decisive factor–that but

for retaliation for that complaint he would *not* have been removed from the

laundry (notwithstanding a compelling consideration like personal safety).  Thus,

evidence discrediting Sass's alternative explanation, or showing that despite its

inherent force it would not have led to his removal in the absence of retaliatory

motive, was crucial.  Yet Strope offered no evidence to undercut the factual basis

of Sass' explanation for his removal.  On the contrary, as noted above, he voiced

complaints that *substantiated* the factual basis for her explanation.

Under the circumstances, we cannot say Strope created a triable issue on

the element of causation.[4]  To do so would impermissibly dilute the heightened

but-for causation standard applicable to retaliation claims in the prison context

under the law of this circuit.

---

[4]     We note that Strope's retaliation claim may have failed on another element
as well:  that the alleged retaliatory action was sufficiently adverse that it "would
chill a person of ordinary firmness from engaging in [protected] activity in the
future."  *Mallard v. Tomlinson*, 206 F. App'x 732, 737 (10th Cir. 2006) (applying,
in prison context, retaliation test from *Mimics, Inc. v. Village of Angel Fire*, 394
F.3d 836, 847 (10th Cir. 2005)); *accord Lewis v. Jacks*, 486 F.3d 1025, 1028-29
(8th Cir. 2007) (applying same test to affirm summary judgment against prisoner
alleging retaliatory work assignments, because "the record contains insufficient
evidence that [challenged] work assignments would chill an inmate of ordinary
firmness from filing grievances").  It is undisputed that "[n]o punitive actions
were taken against" Mr. Strope in connection with his removal from the laundry
and that he was thereafter "employed in a job with comparable pay."  R. vol. 3 at
150, 153.  It is not at all clear that Strope could show his removal from the
laundry–where he was, by his own complaint, in danger–and placement in other
comparably-paid employment makes out a triable case on the chill element of his
retaliation claim.  But, as this element was not the focus of defendants' motion,
we do not affirm summary judgment on this untested alternative ground.  *Evers v.
Regents of Univ. of Colo.*, 509 F.3d 1304, 1309-10 (10th Cir. 2007).

**Access to Religious Services and Proper Kosher Diet**

Mr. Strope's challenge to summary judgment on his claims relating to religious services and diet is utterly perfunctory. His "argument" is one sentence insisting in conclusory fashion that "Plaintiff set forth specific information, facts, and evidence in [the claims in his amended complaint], [and] these claims remain uncontroverted by the defendants who simply again, just deny the claims without any evidence in support." Aplt. Br. at 3. His "statement of facts" on this issue is simply an assertion that "[t]he Court Abused its[] Discretion in granting S.J. to Defendants on plaintiff's 1st Amendment Claims of Access to his Religious [Services], and Access to a proper and balanced Kosher Diet." *Id.* at 2.

This is patently deficient as appellate argument (as well as a gross mischaracterization of the substance of the summary judgment proceedings below). In addressing other rulings challenged on this appeal, we have engaged in a review of the facts and law that, though more thorough than Strope's (and defendants') briefing, at least found some rudimentary starting points therein. Here, we would be manufacturing, from start to finish, any issues we might pursue with respect to the rulings in question. We decline to engage in such advocacy, even on behalf of a pro se appellant. As noted at the outset, "the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record." *Garrett*, 425 F.3d at 840 (citation omitted).

The judgment of the district court is AFFIRMED.

Entered for the Court

Wade Brorby
Senior Circuit Judge