**UNITED STATES of America,**
**Plaintiff,**

v.

**Albert David HAJDUK, Luxury Wheels**
**O.E. Plating, Inc., Defendants.**

**No. CRIM. 04–CR–346–B.**

United States District Court,
D. Colorado.

Oct. 19, 2005.

John M. Richilano, Marci A. Gilligan, Richilano & Ridley, PC, Bruce F. Black, Holme, Roberts & Owen, LLP, Denver, CO, Eric Bentley, Colorado Springs, CO, for Defendants.

David Robert Steinman, United States Attorney's Office, Denver, CO, for Plaintiff.

## MEMORANDUM OPINION AND ORDER ON MOTION TO SUPPRESS AND MOTION FOR FRANKS HEARING

BABCOCK, Chief Judge.

Defendants Albert David Hajduk ("Hajduk") and Luxury Wheels O.E.Plating, Inc. ("LW") move to suppress evidence and information gathered by plaintiff United States of America ("Government") in a criminal case against Defendants for violating federal environmental laws; or in the alternative, for a Franks hearing. The motion is fully briefed and orally argued. Defendants' motion is DENIED, for the reasons set forth below.

## I. Background

### A. Regulatory Framework

LW is a privately owned company based in Grand Junction, Colorado in the business of applying chrome plating to aluminum wheels. Hajduk is LW's Operations Manager. LW's operations involve discharging chemicals through its wastewater that are regulated under city, state and federal law. The City of Grand Junction ("City") operates the Persigo Publicly Owned Treatment Works ("Persigo" or "POTW"), a city owned facility that regulates water discharges from industrial facilities like LW into Persigo's facility, to ensure that all waters Persigo discharges into the waters of the United States comply with state and federal law. Persigo operates under a National Pollution Discharge Elimination System ("NPDES") Permit under the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1251 et seq., and is charged under federal, state and municipal law with regulating entities like LW to ensure compliance with these laws.

Persigo's authority to monitor dischargers like LW is set in federal and state law, as well as in the Grand Junction City Code ("City Code"). Under federal law, Persigo is required to develop a regulatory program that prescribes limits for effluent that enters its facility, sets the amount of effluent each industrial user may contribute and establishes a permit system for industrial users. These permits must include a monitoring system

that includes self monitoring by the discharger and allows for sampling and inspection by Persigo. Persigo is required to obtain compliance information independent of the permitees' own information. Federal law authorizes Persigo to:

"Carry out all inspections, surveillance and monitoring procedures necessary to determine, independent of information supplied by Industrial Users, compliance with applicable Pre-treatment Standards and Requirements by Industrial Users. Representatives of the POTW shall be authorized to enter any premises of any Industrial users in which a Discharge source or treatment system is located or in which records are required to be kept under § 403.12(m) to assure compliance with Pretreatment Standards."

40 C.F.R. § 403.8(f)(1)(v) (2003.).

Persigo, and other POTWs, are also authorized to:

"Randomly sample and analyze the effluent from industrial users and conduct surveillance activities in order to identify, independent of information supplied by industrial users, occasional and continuing non compliance with pre-treatment standards. Inspect and sample the effluent from each Significant Industrial User at least once every year."

40 C.F.R. § 403.8(f)(2)(v) (2003).

In addition, LW is a "Significant Industrial User" under federal law, because it is an electroplater/metal finisher. It is therefore subject to specific "categorical" limits on chemicals and heavy metals that it may discharge. 40 C.F.R. §§ 403.3(t), 433.10 (2003).

The City Code describes the requirements for industrial users who discharge into Persigo, to enable the City to comply with state and federal clean water laws. Grand Junction City Code ("G.J.C.") § 38–26 *et seq.* These requirements include requiring all industrial users who discharge into Persigo to install a sewer with a man-

hole to allow sampling and measuring the wastes, requiring industrial users to acquire a City permit, and allowing the City to monitor and enforce these permits. Users also must provide and maintain, at their own expense, monitoring and sampling facilities, and allow City staff and agents the right to inspect areas of the facility where waste water is created or discharged. G.J.C. § 38–67(d). The City may set up on the user's property sampling and compliance monitoring devices. G.J.C. § 38–67(d) & (e).

LW discharges its waste water into the Persigo system through its own sewer line that runs from its facility to the public sewer line. It runs under property that is owned by LW but outside of its fence line, adjacent to the street. Two manholes provide access to City inspectors, one 45 feet from the LW property line and two feet from where LW's line connects to the City's main sewer line ("Manhole 1") and another at the point where LW's pipe connects to Persigo's sewer line ("Manhole 2.")

### B. Luxury Wheels' Permits

LW has operated under a succession of City Permits since 1993. These Permits comply with applicable City laws and regulations. Among other provisions, the Permits under which LW operated in 2001 and in 2002 state that LW shall allow Persigo staff, upon presentation of credentials, to "enter the premises," have access to any records required by the permit, inspect facilities, equipment and operations, sample or monitor for purposes of compliance and inspect any areas where pollutants can originate. Permit, III.D. Discharges regulated by the Permits must comply with all other "applicable laws, regulations, standards and requirements" contained in city, state or federal law. Permit, II.D.

There is no dispute over the substantive provisions of the Permits. However, there is disagreement over the meaning and implication of the provision requiring Persigo staff to present credentials before exercising the other provisions of the permit, as will be discussed below.

## C. The Disputed Searches

Defendants challenge four separate searches conducted by Persigo, the Grand Junction City Fire Department and the United States Environmental Protection Agency ("EPA.")

### 1. The October 2001 Inspection of the Sampling Box

On October 11, 2001 Persigo staff entered LW's premises without a warrant and drew a sample from a sampling box on LW property. The sample indicated that LW had violated the terms of its Permit, and forms the basis for Count 2 of the Government's indictment against Defendants (negligent violation of the Clean Water Act.) It was also used to support the warrants for EPA's search of the Manhole in January and February of 2002 (see below). Defendants move to suppress this evidence.

The facts of the sampling box search are clear. Dan Tonello ("Tonello") and Scott Williams ("Williams") the Persigo officials responsible for sampling and inspection both testified at the Hearing September 30, 2005 and no defense witness testified to rebut or refute their testimony. The box is located on an outer wall of the LW plant, and takes samples from the wastewater treatment tank located inside the facility. The sampling box can be accessed without entering into any LW facility, but does require crossing LW property. The sample box is padlocked, and accessible only by Persigo officials, who have the only key to the box. In order to obtain a sample from the box, it is necessary for Persigo staff to open the box, place a bottle inside it to draw a sample, and then to return to the box later to remove the bottle. The sample of wastewater contained in the box is then sent to a laboratory to determine if it complies with the applicable effluent limits.

Prior to 2000, Persigo drew samples from LW inside its facility at the waste water treatment tank to assess LW's compliance with the applicable effluent limits. Tonello testified that he contacted LW in the fall of 2000 to discuss with them revising the methodology used to verify LW's compliance. Although LW's samples had up to that point demonstrated compliance, Persigo was concerned that LW always had notice of Persigo's inspection visits and, as a result, Persigo could not prove LW's compliance. Tonello presented these concerns to LW officials at a meeting October 30, 2000. Tonello testified that he had originally proposed that the solution to this problem was to have LW install a sampling device at their sewer at Manhole 1, under G.J.C. § 38–53. LW proposed instead that they install an external sampling box to draw liquid from the tank, at the same sample location Persigo had been using, to allow Persigo to draw samples without notice to LW. This solution was less expensive and preferred by LW. Tonello agreed to this suggestion. LW's Permit was not amended to demonstrate the installation of the sampling box.

Tonello testified that there was no question that the purpose of installing this new equipment was to allow Persigo to obtain samples without notice to LW, even to sample covertly. Tonello stated, and his notes of the meeting make clear, that he informed LW that if it wished to continue discharging into the Persigo works, it would need to install either a sampling box or a sampling mechanism in its sewer pipe.

Tonello and Williams both testified that at all times when they took samples from

the box, they used a clearly marked city vehicle, carried credentials and would have showed credentials if asked. They also stated that they did not call in advance or stop by the main office to announce their presence. They drove up and walked across LW property to the sample box, without crossing a gate or security barrier, took a sample, and left. At the time of the sampling at issue, they took the samples at night to avoid detection. Tonello testified that the sample taken covertly showed a higher level of metal effluents than samples taken overtly. Tonello and Williams both testified that at no point during discussions of the installation of the sampling box did LW resist or protest the need for external sampling, challenge Persigo's right to insist on such sampling or raise any issues regarding the need for Persigo officials to show credentials when checking the sampling box. I find that Tonello and Williams testified credibly in all respects.

2. The Inspections of the Manhole, February 2002 and September 2003

Defendants also challenge searches of the manhole that provided evidence that forms the basis for some of the counts against Defendants, and that Defendants believe the Government will use at trial.

The searches at issue all involve Manhole 1. This Manhole is owned by the City of Grand Junction and is located in an unfenced and apparently unused area of LW's property adjacent to a public street. Manhole 1 is located about two feet from the location where the LW sewer line connects to the main City line and, thus, where LW's effluent is intermingled with other wastewater. The water flowing through the sewer at Manhole 1 includes both LW's process waste and domestic waste. The Manhole enters into a sewer that is owned by LW, and once the wastewater reaches Manhole 1 LW does not have any physical means to prevent it from reaching the main sewer line. The sewer line is not accessible to the public. City workers can enter the sewer line from Manhole 1 only by using a special tool to open the Manhole. Prior to the searches at issue, Manhole 1 was not a sampling point for LW compliance and Manhole 1 was not directly related to the Persigo pretreatment program.

EPA applied for and executed its first search warrant on January 24, 2002. This warrant authorized EPA to cut an opening into the top of the LW service line and to conduct surreptitious sampling at Manhole 1. Defendants claim that this search warrant lacked probable cause and is thus invalid, because it is tainted by Persigo's unlawful samples from the sampling box and on multiple false statements and affidavits.

On or about February 5–7, 2002, Persigo conducted its own searches at Manhole 1, taking a sample of the water from the sewer at the same location where EPA cut the line. Persigo's samples found several permit violations. This information was provided to EPA and forms the basis for Counts five to seven against Defendants. Defendants claim that these warrantless searches were not allowed under the LW Permit and were thus unlawful.

On September 12, 2003 the City of Grand Junction Fire Department and Persigo staff conducted another search at Manhole 1. This search followed an incident in a sampling shed LW assembled to expedite additional sampling so LW could demonstrate compliance. In July of 2002, when Williams tried to enter the shed to obtain a sample, he suffered an exposure of allegedly toxic gas, causing chronic health effects. The search on September 12, 2003 involved installing a sampler in the sewer line. City officials returned September 17, 2003 to retrieve their samples and also to collect a "grab sample" of water in the sewer. These samples re-

vealed an additional Permit violation, which forms the basis for Count 19 in the indictment (negligent violation of the Clean Water Act.). Defendants argue that the City conducted these searches in violation of LW's permit.

### 3. The Second EPA Search Warrant, February 2002

On February 11, 2002, the EPA requested and was issued an additional search warrant, authorizing EPA to search the LW facilities for samples, technical data, diagrams of plating processes, photographs and records and to conduct interviews with LW employees. Defendants contend that this search warrant is invalid because it is based on the same unlawful information and false statements that were the basis for the first search warrant.

## II. Motion to Suppress

Defendants challenge the warrantless searches conducted by the City of Grand Junction as violating their Fourth Amendment rights. Specifically, Defendants argue that these searches were not justified under LW's Permits with the City or by federal law, that the doctrine of warrantless searches for "closely regulated industries" does not apply to this search, that Defendants did not consent to these searches, that the City easement to access the manhole does not justify the manhole searches and that the City cannot prevail on a theory that Defendants abandoned their wastewater. Moreover, Defendants argue that the City's search of its sewer line constituted an invalid use of City administrative procedures to implement a federal prosecution. The Government disputes all of these arguments, and also contends that the searches of the manhole and of the sampling box are justified under the "open fields" doctrine, and that Hajduk lacks standing to challenge these searches.

### A. Are the searches of the Manhole and the Sampling Box Searches under the Fourth Amendment?

■ In general, the Constitution requires a warrant and probable cause for the government to undertake a search. U.S. Const. amend. IV. This applies to searches of private businesses, as well as to residences. See v. City of Seattle, 387 U.S. 541, 543, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). However, Fourth Amendment requirements only apply to places and to objects where an individual's expectation of privacy is objectively reasonable. Kyllo v. U.S., 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). So, before Defendants can invoke the protections of the Fourth Amendment, they must demonstrate that they had an objectively reasonable expectation of privacy in the areas that Persigo searched.

### 1. Do Defendants have a "Reasonable Expectation of Privacy" in Wastewater in a Sewer Line leading into a public Sewer Line?

■ The Government argues that the searches of the manhole and the sampling box do not violate Defendants' Fourth Amendment rights because Defendants have no reasonable expectation of privacy in their wastewater flowing irrevocably into the City's public sewer line. I agree as to the manhole.

The Government asserts that Riverdale Mills Corp. v. Pimpare, 392 F.3d 55 (1st Cir.2004) directly addresses this situation. In Riverdale, the First Circuit considered whether a business had a reasonable expectation of privacy in wastewater flowing irretrievably into a public sewer system. Id. at 63. At issue was the validity of EPA's warrantless, unconsented-to search of wastewater at a manhole located on Riverdale's private property. Id. at 57–58. The court considered whether Riverdale

had an objectively reasonable expectation of privacy in this wastewater, to assess whether the sampling constituted a search at all. *Id.* at 63–64. The court stated that such a reasonable expectation of privacy depends on a variety of factors, including the character of the substance searched, whether the premises are residential or commercial, whether the manhole was on private property and whether the manhole was in an "open field" or in the more protected "curtilage" of a home or business. *Id.* at 64.

The court determined that the controlling fact was that the wastewater was flowing irretrievably into a public sewer 300 feet away and would inevitably reach the public sewer line. *Id.* It analogized the wastewater to trash left at curbside, over which the owner enjoys no reasonable expectation of privacy, because it has been intentionally left outside and because anyone can rummage through it. *Id.*, [*citing California v. Greenwood*, 486 U.S. 35, 40–41, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988).]

Defendants argue that *Riverdale* is inapplicable here, both because its facts are distinguishable and because it was wrongly decided. Defendants assert that wastewater in this context has not been exposed to the public and is thus not similar to curbside trash. Also, the agents in *Riverdale* were originally on the property with consent, and only took the particular samples without consent; whereas here the City inspectors never had consent to enter the property.

I find *Riverdale* persuasive. The *Riverdale* court correctly identified the issue as whether Defendants' expectation of privacy is reasonable. I conclude that in this case Defendants could not have had a reasonable expectation of privacy in their wastewater indisputably flowing into the public sewer system. Persigo searched in a location its own regulations specified as necessary for monitoring effluent discharges. G.J.C. § 38–53. Like in *Riverdale,* the inspectors here took the sample, without permission, from LW's private property, using a city owned manhole. The analogy to trash left on the sidewalk is persuasive, since LW's wastewater was discharged intentionally as waste. While it is true that at the point it was searched in the manhole, it was not accessible to the public, the more important factor here is that it was headed towards the public sewer system without any possibility or expectation of retrieval. I hold that in this circumstance any expectation of privacy in this sewer water is objectively unreasonable. Moreover, Defendants' argument that the inspectors in *Riverdale* were initially on the property with consent is legally irrelevant. The issue is whether there was consent to the sampling; in both cases there was not.

I therefore find and conclude that the sampling from the sewer pipe does not constitute a search under the Fourth Amendment because there is no reasonable expectation of privacy in wastewater headed irretrievably into a public sewer system.

■ The Government also argues that the doctrine of *Riverdale* applies to the search of the sampling box. The sampling box analyzes water samples from the wastewater treatment tank. The government contends that since water from this tank has already been treated and is destined for the public sewer system, sampling from this tank similarly does not constitute a search. The government claims that the fact that it is a few hundred feet farther from the sewer system is irrelevant since this water also is irrevocably flowing towards the public sewer.

LW argues that the key factor in *Riverdale* was the user's inability to prevent the water from flowing to the public sewer. Here, while LW cannot prevent the water

once it reaches Manhole 1 from going to the public sewer pipe, LW can prevent the water from the wastewater treatment tank from reaching the public sewer. LW therefore retains an expectation of privacy in this water, even under the doctrine of *Riverdale.* I find this argument persuasive. LW loses its reasonable expectation of privacy in its waste water only when the water flowing to the sewer pipe cannot physically be retrieved. This is true of the water at Manhole 1, but not inside the facility at the tank and its external sampling box. LW therefore retains an expectation of privacy in the water in the tank, and the sampling of that water constitutes a search under the Fourth Amendment.

## B. Does an Exception to the Fourth Amendment Requirement for a Warrant Apply to these Searches?

 Even where there is a reasonable expectation of privacy triggering Fourth Amendment protections, there are several recognized exceptions to the Fourth Amendment requirement for a warrant. The Government argues that several of these exceptions apply to these searches. I will address each of their arguments individually.

### 1. Did Defendants Consent to these Searches?

The Government argues that Persigo's search of the sample box and of the manhole are justified because Defendants consented to these searches. The Government advances two distinct theories of consent.

The Government argues first that at the meeting October 30, 2000 Defendants consented to the placement of the sampling box. The Government contends that since the installation of the sampling box was LW's initial idea and since LW never resisted the idea of a mechanism for Persigo's independent sampling of LW, Defen-

dants consented to the installation of the sampling box.

Defendants argue that their acquiescence to installation of the sampling box, even if it was their own idea, cannot be lawful consent because Persigo did not give them the choice not to have an independent sampling mechanism at all. Defendants assert that since they had no choice to refuse Persigo's request for independent sampling, they did not in fact consent. Defendants point out that Tonello's own notes of the meeting October 30, 2000 state that "It was explained that the outside sample site would need to be installed regardless." The Government does not dispute that if LW wished to retain its permit to discharge wastewater it did not have the option not to install an independent sampling mechanism.

Although the question is a close one, I find and conclude that Defendants' agreement to place a sampling box outside their facility constitutes consent to installation of the box within the meaning of the Fourth Amendment. As Tonello's credible testimony showed, LW exercised its choice to the less expensive alternative without resistance, protest or challenge.

 The Government's second argument for consent is that the terms of LW's Permits, and the provisions of the City Code incorporated into the Permits, give Persigo the authority to require this kind of independent sampling. The Government contends that LW, like all businesses that discharge wastewater into the Persigo system, agree to these Permit terms for the privilege of discharging wastewater into the City system. LW's agreement to the Permit terms therefore constitutes consent to the search and inspection provisions that are part of the Permit, which includes installation of the sampling box, taking samples from the box without notice to LW, and sampling at the manhole.

The Government points to several Permit provisions and City Code provisions that support its position. The Permit section that addresses "monitoring requirements" states that "Unscheduled sampling, monitoring and/or inspections shall occur when deemed necessary by the (City)." Permit, III(D)(4). The City Code states that "The City Manager may set up on the user's property such devices as are necessary to conduct sampling, inspection compliance monitoring and/or metering operations." G.J.C. § 38–67(e). In addition, the Code establishes that the City may require users to "install a suitable control manhole together with such necessary meters and other appurtenances in the building sewer to facilitate observation, sampling and measurement of the wastes." G.J.C. § 38–53.

Defendants offer no argument to refute these provisions of the City Code authorizing Persigo to require sampling equipment. In return for the privilege of discharging waste, Defendants necessarily consented to application of the City Code and Permit requirements as a matter of law under the Fourth Amendment. I therefore find and conclude that the City may require LW to install a sampling box, and sampling equipment at Manhole 1.

■ But, Defendants argue that any consent they gave to installation of this equipment is invalid because it relies on a false assertion of government authority. While it is true that consent obtained under a false assertion of authority is invalid under the doctrine established in *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), Defendants have made no showing here that Persigo made a false assertion of authority. As discussed above, the City Code gives the City authority to require regulated users to install sampling devices on their premises, so *Bumper* does not apply.

■ The crux of Defendants' argument thus turns on the manner in which Persigo officials entered LW property to take samples. Defendants assert that even if the City's installation of the equipment was valid, Persigo's inspection of the box and the taking of the samples at Manhole 1 violated the Permit and the Code because Persigo personnel took these samples covertly, at unreasonable times and without showing credentials.

The Code and the Permit have multiple provisions that address the showing of credentials. Defendants rely on provisions in the Permit and the City Code that at first blush seem to require the showing of credentials during inspections. The Permits' provisions on "Inspection and Entry" allow the City to inspect and enter LW's premises, and to sample and monitor, "upon the presentation of credentials." Permit, V.C. Similarly, the City Code's provision governing the City's Right of Entry allows entry for purposes of sampling and inspection "upon the presentation of credentials." G.J.C. § 38–65(1).

The Government, conversely, relies on provisions of the City Code that do not require the showing of credentials for this purpose. G.J.C. § 38–29 requires that City employees *"bearing* proper credentials and identification" may enter properties to inspect, sample and test, but does not *require* showing of credentials. (emphasis added.) Defendants do not dispute that the City inspectors did carry credentials during these inspections. Significantly, G.J.C. § 38–67(e) states in relevant part:

"The City Manager may set up on the user's property such devices as are necessary to conduct sampling, inspection, compliance monitoring and/or metering operations. *Where a user has security measures in force which require proper identification and clearance before en-*

*try into such user's premises,* the user shall make necessary arrangement with the security guards so that, upon presentation of suitable identification, personnel authorized by the City or from the State or EPA will be permitted to enter without delay for the purpose of performing their specific responsibilities under this article." (emphasis added).

The issue reduces to determining which provisions of the City Code and the Permit control the searches in this case. After reviewing the City Code and the Permits in their entirety, I find and conclude that the Government's argument is persuasive. The language of G.J.C. § 38–67(e) indicates that the requirement for presenting credentials is relevant only where entry involves interactions between city inspectors and a facility's security personnel. This conditional language ("where a user has security measures which require proper identification ...") suggests that the presentation of credentials is necessary only where it is essential to entry. Where, as here, inspectors bearing proper credentials, G.J.C. § 38–29, could access the sampling box and the manhole without passing any LW security measures, the City Code states that the City Manager has the right to "ready access at all reasonable times." G.J.C. § 38–67(e).

This conclusion is reinforced by sections of the City Code, the Permits and federal regulations that give Persigo the right to engage in unscheduled and unanticipated inspections and sampling, Permit, III. D.(4), that require the City to conduct surveillance independent of defendants, 40 C.F.R. § 403.8(f)(2)(v) (2003), and that allow the City to install sampling devices on the user's premises. G.J.C. § 38–67(e). If the city has the right to install sampling devices, the right to engage in unannounced inspections and the duty to gather samples independent from the user, without any apparent notice requirement, it is illogical to conclude that the failure to show credentials before checking a device, when showing credentials is unnecessary for security reasons, somehow violates the City Code, the Permit, or the Fourth Amendment.

Defendants argue that their interpretation of the City Code should prevail under the principle that in the case of an inconsistency within the Code or the Permit, more specific provisions should prevail over more general provisions. However, in this case this principle is not helpful. The provision Defendants rely upon, G.J.C. § 65(1) and the provision the Government relies upon, G.J.C. § 67(e), both are in the same section of the Code, relating specifically to pretreatment of industrial wastes. Similarly, the provision of the Permit allowing "unscheduled sampling, monitoring and/or inspections" is in the section on "Monitoring Requirements", while the Section requiring showing credentials is in "Responsibilities and Limitations."

Defendants rely also on cases that they claim support their contention that regulated entities have the right to refuse a request for inspection, and that mandatory showing of credentials is essential to protecting this right. However, these cases do not support Defendants' argument. *Public Service Co. of Indiana, Inc., v. U.S. E.P.A.,* 509 F.Supp. 720 (S.D.Ind.1981), analyzes the level of probable cause required to justify an administrative search warrant under the Clean Air Act, 42 U.S.C. § 7401 *et seq.* In that case, EPA inspectors showed credentials and were denied entry to a regulated facility, and then sought an administrative search warrant. In *Boliden Metech, Inc., v. U.S.,* 695 F.Supp. 77 (D.R.I.1988), EPA inspectors also sought access to a facility, showed credentials, were denied access and then sought an *ex parte* EPA search warrant under the Toxic

Substances Control Act ("TSCA"), 15 U.S.C. § 2601 *et seq.* The case analyzed the extent to which TSCA grants EPA this authority. In both cases EPA inspectors desired to inspect a facility, showed credentials and were denied access. Defendants conclude from these cases that inspectors must show credentials before an inspection and that facility operators have a right to refuse an inspection. However, these cases only analyzed the statutory frameworks of TSCA and the CAA; they did not address the provisions of the Grand Junction City Code incorporated into a wastewater treatment permit under the Clean Water Act. In addition, these cases did not address the situation here, where City staff inspected their own sampling equipment on the curtilage of an industrial facility installed under lawful authority for the purpose of ensuring compliance.

Defendants also argue that the City Code and the Clean Water Act limit regulatory inspections to occur only at "reasonable times." G.J.C. § 38–65(*l* ).(See also G.J.C. § 38–67(e), 33 U.S.C. § 1318(a)(2)(B).) The Persigo searches, they contend, were done in the middle of the night and surreptitiously and therefore outside of the requirements of the City Code. However, Defendants do not anywhere state why night time review of a sampling box is unreasonable, especially in light of City suspicions that defendants were tampering with the box. Similarly, defendants do not explain why taking samples from a City-owned manhole, at night, is unreasonable. In neither case did City inspectors enter a facility, intrude on work or investigate anything other than City-owned sampling apparatus. Neither the Permit nor the City Code defines the meaning of the word "reasonable" in this context.

Defendants' reliance on *Mimics v. Village of Angel Fire,* 394 F.3d 836, 846 (10th Cir.2005) is misplaced. *Mimics* involved a search of the inside of an office, where police officers entered through the back door. The statute at issue in that case required consent, and if the inspector failed to get consent the inspector had to seek a warrant. *Id.* The court interpreted the reasonableness language in the statute as protecting the occupant's right to deny consent to the inspector. *Id.* at 847. Defendants argue that the reasonableness requirement here similarly ensures that the owner is present to provide or withhold consent to the search.

But under the regulatory regime in this case, LW as a regulated entity does not have the legal right to refuse consent to an inspection of the sample box or of the manhole. 40 C.F.R. § 403.8(f)(1)(vi)(B) (2003) (POTW's shall have the duty to "carry out inspections, entry or monitoring activities...") Nowhere does the City Code or a Permit grant a regulated entity the right to deny consent to Persigo to carry out its regulatory duties. The Permits specifically grants the City the right to conduct "unscheduled sampling, monitoring and/or inspections ... when deemed necessary" by the City. Permit III.(d)(4). Moreover, here, unlike *Mimics,* the City did not enter any LW building or facility, or even go through a gate, but only crossed LW's land to access equipment that was owned by the City.

Finally, Defendants argue that the City Code and the Permits cannot mean that City inspectors may access the sampling box and the sewer line without notice and at all hours of the day or night, because such a construction of the City Code would eviscerate Defendants' Fourth Amendment rights. I disagree. At issue here is not the right to make a surprise no-knock search of a home, or even of an office. These searches are by City regulators accessing their own equipment, lawfully in-

stalled, outside of any security perimeter or physical structure, to ascertain whether a regulated entity is complying with the terms of its Permits. Such a search does not require the showing of credentials or being limited to particular hours to comport with the Fourth Amendment.

Defendants' argument is curious for another reason. Consent is an exception to the Fourth Amendment warrant requirement. By definition, once a party consents to a search the search no longer requires a warrant. Defendants here seem to argue that the terms of its Permit could not constitute consent to these searches, because absent consent these searches would violate the Fourth Amendment. This kind of circular reasoning is foreclosed by my finding of Defendants' consent as an exception to the Fourth Amendment.

I therefore find and conclude that the searches of the manhole and the sampling box did not violate the Permits or the City Code provisions regarding credentials and reasonable hours. Since Defendants agreed to submit to searches under the Permits and the City Code, these searches are justified under the Fourth Amendment by Defendants' consent.

## C. Does the City's Easement Grant the City Access to the Manhole for Sampling?

■ The Government asserts that the City's sampling at Manhole 1 is also justified by the City's easement to use the LW sewer line. The City has an easement, executed in 1957 by the City and the former owner of the property now owned by Luxury Wheels, "for the installation of a sewage outfall line and other utility lines, the maintenance thereof and for roadway purposes." Defendants argue that the City Code requires that City access to an easement must be done "in full accordance with the terms" of the easement, G.J.C. § 38–31, and that Persigo's sampling for

waste discharges cannot possibly be covered by the easement language, since it does not expressly authorize sampling and neither Persigo nor the clean water management system it enforces even existed in 1957 when the easement was established.

The Government argues that the sampling of discharges in the sewer is consistent with the "maintenance" of the sewer prescribed in the easement. The Government contends that sampling waste enforces limits on caustic discharges and thus helps maintain the pre-treatment systems as a whole and helps protect the workers who maintain the system. At the Hearing September 30, 2005, Tonello testified that this link between the sampling at the manhole and protection of the Persigo works is established both in the City Code and in federal regulations.

G.J.C. § 38–62, describing the purposes and policy of the pretreatment program, states that the objective of the program is to "Prevent the introduction of pollutants into the municipal wastewater system and the Waste Water Treatment Works ("WWTW") which will interfere with or upset the operation of the WWTW treatment plant..." G.J.C. § 38–62(a)(1), and also to "Protect the health and safety of city and county residents and WWTW workers." G.J.C. § 38–67(a)(8). 40 C.F.R. § 403.2(a) (2003) similarly states that the purpose of pretreatment regulation is "To prevent the introduction of pollutants into POTWs which will interfere with the operation of a POTW."

■ Defendants argue that the easement is limited to what the parties intended in 1957, and that Tonello's testimony characterizing the overall protection of the Persigo system as "maintenance" under the easement cannot justify Persigo's use of the easement for sampling. Defendants argument is unpersuasive for several reasons. First, it misapplies the law for in-

terpreting easements. In Colorado, an easement holder "may make any use of the easement (including maintenance and improvement) that is reasonably necessary to the enjoyment of the easement, and which does not cause unreasonable damage to the servient estate or unreasonably interfere with the enjoyment of the servient estate." *Lazy Dog Ranch v. Telluray Ranch Corp.,* 965 P.2d 1229, 1238 (Colo. 1998). In this case, the City's use of the easement for monitoring discharge is lawful if it is a reasonable extrapolation of the original purpose of maintenance as long as it does not interfere with LW's use of the land. LW has not argued that the sampling equipment or the sampling interfered with its use of the land, or in some way did not "take place within the previously determined dimensions of the easement." *Id.*

Second, the City Code itself states that the City may enter an easement for the purposes of "inspection, observation, measurement, sampling, repair and maintenance of any portion of the wastewater system lying within such easement." G.J.C. § 38–31. Thus, even if the easement itself does not grant the right to sample for waste, the City Code grants the City access to easements in order to sample for wastes. Furthermore, Tonello testified credibly that given the nature of LW's wastewater, the quality of that wastewater is critical to the maintenance of Persigo's system.

I therefore find and conclude that the City was using its easement lawfully when it entered the manhole to sample Defendant's wastewater.

In addition, Defendants assert the City Code requires City inspectors using the easement to present credentials, which Persigo officials did not do. However, the City Code language relating to credentials does not support Defendants here, since the language explicitly grants access to easements for City officials "bearing proper credentials and identification..." G.J.C. § 38–31. The City Code does not require presenting credentials, and Defendants do not dispute that Persigo officials carried credentials when they entered.

And, as discussed below, because Persigo's sampling bears no Fourth Amendment taint, Defendants' argument that the EPA warrants are tainted because they rely on data obtained from these Persigo searches, fails.

*D. Are the Warrantless Searches of the Sampling Box and the Manhole Justified Administrative Searches of Luxury Wheels as a "closely regulated industry?"*

The Government also argues that its searches of the sampling box and the manhole are justified under the "closely regulated industry exception" to the Fourth Amendment warrant requirement. I disagree.

In general, warrantless administrative searches of commercial premises are forbidden. *See, supra,* 387 U.S. at 543, 87 S.Ct. 1737. An exception to this rule is searches of businesses in "closely regulated industries." *New York v. Burger,* 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). In such an industry, where there is pervasive government regulation, there is, in effect, no reasonable expectation of privacy. *Id.* Thus, "where the privacy interests of the owner (of the business) are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment." *Id.* at 702, 107 S.Ct. 2636.

Determining whether a warrantless administrative search is valid under

this doctrine is necessarily a two-part inquiry. First, I must ascertain if the business subject to search is in fact a "pervasively regulated" industry. *Id.* Second, even if the industry is closely regulated, the statute authorizing the search must serve a substantial government purpose, the warrantless search provisions must be necessary to achieve these government interests, and the statute must contain sufficient "certainty and regularity" in its inspection program to provide the business owner with the "constitutionally adequate substitute for a warrant." *Id.* at 702–703, 107 S.Ct. 2636. Because I find and conclude that LW is not a closely regulated business, I do not address the second part of this inquiry.

1. Is Luxury Wheels a "closely regulated industry?"

■■■ The Supreme Court has found that industries are "closely regulated" when they have "a long tradition of close government supervision," such as businesses that sell liquor or firearms. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978.) However, the length of time a regulation has been in place is only one factor in determining if an industry is closely regulated. *Donovan v. Dewey,* 452 U.S. 594, 606, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981). Rather, a court examines "the pervasiveness and regularity of the federal regulation" and the effect of such regulation upon an owner's expectation of privacy. *Id.* The Court has found that the federal law regulating occupational safety and health lacks the history or pervasiveness to justify warrantless searches of any businesses engaged in interstate commerce unless such a business is already "regulated or licensed." *Marshall, supra,* 436 U.S. at 313–14, 98 S.Ct. 1816. Conversely, because federal mine safety laws apply narrowly and specifically to mining and its unique hazards, but not to all business in

interstate commerce, stone quarries are pervasively regulated and, thus, may be searched by government inspectors without a warrant. *Donovan, supra,* 452 U.S. at 602, 101 S.Ct. 2534.

The Court in *Burger* found that "junk shops" are closely regulated because the New York State law at issue required a state license, imposed mandatory registration fees, required owners to maintain detailed records and make them available for police inspection, and subjected owners to criminal and civil penalties for failing to comply with these requirements. *Burger, supra,* 482 U.S. at 704–705, 107 S.Ct. 2636. The Government asserts that these same conditions apply to regulation of LW under the Clean Water Act. LW must obtain a permit to operate, LW is required to maintain detailed records and make these records available for public inspection, and LW is subject to civil and criminal penalties for violations.

Defendants argue that the Clean Water Act does not create a closely regulated environment to enable warrantless searches of commercial facilities. Defendants cite *Dow Chemical Co. v. U.S.,* 536 F.Supp. 1355 (D.C.Mich.1982) for the proposition that industries regulated under the Clean Air Act are not "pervasively regulated" because it, like other environmental laws, applies to all industries and is thus similar to OSHA regulation in *Barlow's* and not to regulation of mining as in *Donovan. Id.* at 1361. *Dow* cites an article from a former EPA official suggesting that licenses under the Clean Water Act are not regulatory licenses necessary for conducting business, like liquor or gun licenses and, thus, are distinguishable from Supreme Court cases concluding that these industries are pervasively regulated. *Id.*

The other cases Defendants cite do not directly relate to the criteria for determining if an industry is highly regulated, and

do not analyze the circumstances under which a federal environmental law constitutes a pervasive regulation sufficient to trigger this exception to the warrant requirement. *Reeves Brothers, Inc., v. EPA,* 956 F.Supp. 665, 668–671 (W.D.Va.1995) addresses a situation where EPA officials entered private property through a locked gate and does not consider whether an industry regulated under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.,* is pervasively regulated. *Boliden Metech* concludes that TSCA authorizes EPA to obtain administrative warrants *ex parte,* but does not address pervasively regulated industries. 695 F.Supp. at 80.

More instructive is the Tenth Circuit's decision in *V–1 Oil Company v. State of Wyoming, Department of Environmental Quality,* 902 F.2d 1482 (10th Cir.1990). The court considered whether the gasoline industry was pervasively regulated in order to consider the constitutionality of a state environmental official's warrantless entry onto the property of a gas station to take a soil sample. *Id.* at 1486. The court reviewed the state and federal regulatory structure governing gas stations. *Id.* The court noted that state law requires dealers to obtain a license and pay a fee, to display prices conspicuously, and to collect gas taxes. *Id.* The court also noted that under federal law owners of underground storage tanks must furnish substantial and detailed information about the tanks and must permit certain inspections and monitoring. *Id.* The court concluded that the "aggregation" of state and federal requirements governing gas stations in Wyoming is "equally intrusive" to the requirements governing vehicle dismantlers the Supreme Court considered in *Burger,* and concluded that gas stations are a pervasively regulated industry in Wyoming. *Id.*

▮ I conclude that LW is not a pervasively regulated industry. While LW is subject to a regulatory regime similar to those that made businesses "closely regulated" in *Burger* and *V–1 Oil Company,* I must also consider the policy rationale behind this doctrine. The importance of the warrant requirement under the Fourth Amendment is so critical that this exception should be applied narrowly, and truly be the exception rather than the rule. *See Marshall, supra,* 436 U.S. at 313, 98 S.Ct. 1816. Every case that involved closely regulated industries has distinguished between statutes that apply to single industries—such as liquor sales, gun dealing, or mining—and statutes that apply broadly to any industry in interstate commerce. *Id.* The statute here is a general purpose environmental law applied to industrial companies. I am unaware of any precedent for declaring that a business is subject to warrantless administrative searches as "closely regulated" solely because it is subject to general purpose environmental laws. In *Dow* the court found that the chemical industry is not "closely regulated." 536 F.Supp. at 1361. The Tenth Circuit in *V–1 Oil Company* specifically concluded that warrantless administrative searches are only valid pursuant to statutes that apply to single industries, and not to statutes of general applicability. 902 F.2d at 1487. The Supreme Court in *Marshall* indicated that warrantless administrative searches were more tolerable in statutes that "apply only to a single industry" or where the statutory framework already allows for court enforced administrative searches. *Marshall, supra,* 436 U.S. at 321, 98 S.Ct. 1816. I conclude that the Supreme Court intended this exception to apply only where a specific industry is pervasively regulated, and not to apply where a particular activity, such as wastewater disposal, is broadly regulated among all businesses that operate in interstate commerce.

The Government argues that LW is pervasively regulated not because it is a wastewater discharger under the Clean Water Act, but because as an electroplater/metal finisher it is a "Significant Industrial User" which is regulated under a more severe regime due to the hazardous chemicals and heavy metals it discharges. 40 C.F.R. §§ 403.3(t), 433.10 (2003). The government contends that this more stringent regulatory framework makes LW a closely regulated industry. I disagree. Numerous federal statutes regulate businesses that handle hazardous substances. If a regulatory regime addressing discharging or handling hazardous substances can by itself make a business pervasively regulated, then any business subject to regulation under the Resource Conservation Recovery Act, ("RCRA"), 42 U.S.C. § 6901 *et seq.*, CERCLA or TSCA is closely regulated and is subject to a reduced level of Fourth Amendment protection. This cannot be what the Supreme Court had in mind when it defined this doctrine as exceptional.

I therefore find and conclude that LW is not a closely regulated industry and that Persigo may not conduct warrantless administrative searches under this doctrine.

And, because I conclude that LW is not a closely regulated industry, I need not address the second part of this inquiry, whether the warrantless search of LW comported with the requirements of *Burger*.

E. *Was the Search of the Manhole and the Sampling Box Valid Under the Open Fields Doctrine?*

 The Government also argues that Defendants had no reasonable expectation of privacy in the manhole or sampling box because these devices were located in open fields within LW's industrial facility so were subject to a lesser degree of privacy. The open fields doctrine recognizes that property owners have a lesser expectation of privacy in open areas of their land than they do in areas inside buildings or facilities. *Oliver v. U.S.*, 466 U.S. 170, 179, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). Under this doctrine, the government may inspect open areas of an industrial complex from public airspace without a warrant. *Dow Chemical v. U.S.*, 476 U.S. 227, 239, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986). The Government may also properly use as evidence anything government agents see that suggests unlawful activity that is openly visible in the open field. *Oliver, supra*, 466 U.S. at 174, 104 S.Ct. 1735.

Here, Persigo did more than observe the manhole or the sampling box. In both cases, it engaged in the physical removal of substances. The "open fields" doctrine allows an inspection via aerial flyover, or perhaps a visual inspection of monitoring equipment within the LW fence line. But the searches here went beyond visual inspection; they involved physical contact with and removal of samples of water.

The other cases the Government cites are unpersuasive. In *Oliver*, the police in one instance observed a marijuana field and then arrested defendants, and in another used visual observations of marijuana to obtain a search warrant. 466 U.S. at 174, 104 S.Ct. 1735. In neither situation did the officers remove items not clearly visible. In *Air Pollution Variance Board v. Western Alfalfa Corp.*, 416 U.S. 861, 865, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974), the open fields doctrine applied to an inspector engaging in opacity tests of the air within a factory complex, but not physically removing samples and only testing publicly visible smoke emissions.

While it is true that Defendants have no reasonable expectation of privacy in wastewater flowing irretrievably through a sewer to a public sewer, I cannot under these

facts extend the open fields doctrine to allow City inspectors to open a manhole or a sample box and remove samples of waste water. The open fields doctrine does not apply when inspectors enter private property to remove objects not immediately visible. I therefore conclude that this search is not justified under the "open fields" doctrine.

### F. Does this Search Constitute an Improper use of City Administrative Procedures for a Federal Criminal Investigation?

■ Defendants argue that the City's manhole searches are invalid for an independent legal reason—they constitute an unlawful use of the City administrative procedure as a surrogate for EPA's criminal investigation. Defendants assert that the City acted as an agent of the EPA in the manhole search, since the City used the same access point as EPA, borrowed EPA's sampling equipment and passed the data on to EPA to use in its criminal investigation. Defendants cite *U.S. v. Johnson*, 994 F.2d 740, 742–744 (10th Cir. 1993) and *S & S Pawn Shop Inc. v. City of Del City*, 947 F.2d 432, 441 (10th Cir.1991) in support.

■ Defendants are correct that "an administrative inspection may not be used as a pretext solely to gather evidence of criminal activity." *Johnson, supra,* 994 F.2d at 742. However, "the discovery of evidence of crimes in the course of an otherwise proper administrative inspection does not render that search illegal ..." *Burger, supra,* 482 U.S. at 716, 107 S.Ct. 2636. The court in *Johnson* found the state administrative inspection to be pretext because the state inspector had no independent basis to search defendant's premises, the state law authorized searches only by state agents and not by federal agents and the state agent had not participated in the federal investigation and had no knowledge of it. *Johnson, supra.* 994 F.2d at 742. The court also found that the state had a minimal history of oversight and investigation of defendant's shop, further reinforcing the conclusion that the state investigation was pretext for the federal investigation. *Id.*

The facts here are different. Persigo had a long-standing regulatory relationship with LW, as defined by the Permits and City law, going back to 1993. The manhole and the sampling box were required by the City Code. Moreover, the City Code requires Persigo to make samples available to EPA on request. G.J.C. § 38–67(f)(3). Persigo and the EPA had overlapping responsibilities to regulate effluents discharged by LW; this is not Persigo acting as EPA's agent in a criminal investigation.

*S & S Pawn Shop Inc.*, the other case Defendants cite, does not address the improper role of an administrative search as a proxy for a federal criminal investigation at all; it addresses the extent to which a City's administrative search procedure was improperly used for a City's criminal investigation. 947 F.2d at 441. There was no issue in that case of a city agency acting as an agent for a federal agency. *Id.*

I find and conclude that the Persigo search of the manhole was not an improper use of the City administrative mechanism to assist a federal criminal investigation.

### G. Does Hajduk Have Standing to Challenge the Searches?

■ The Government argues that Hajduk lacks standing to challenge the searches. In general, an employee only has standing to challenge the search of items when the employee has a reasonable expectation of privacy in the area searched. *United States v. Leary*, 846 F.2d 592, 595 (10th Cir.1988.) An individual's claim to privacy from government

intrusion must be reasonable in light of all the surrounding circumstances. *Id.*

In a commercial environment, the reasonable expectation of privacy must be determined by the relationship between an employee and his items, and must be analyzed on a case by case basis. *O'Connor v. Ortega,* 480 U.S. 709, 718, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). An employee's standing to challenge a search is based on numerous factors: the business "nexus" between the employee and the area searched, whether the employee works regularly in a particular area, whether the employee owns the object searched, whether the items are personal property or commercial property, whether the area is properly considered under the employer's control, whether the employee is present at the time of the search and whether the employee attempted to keep the area or the items protected. *U.S. v. Anderson,* 154 F.3d 1225, 1230–1232 (10th Cir.1998). The Tenth Circuit has summarized this test as considering "(1) the employee's relationship to the item seized, (2) whether the item was in the immediate control of the employee when it was seized, and (3) whether the employee took actions to maintain privacy in the item." *Id.* at 1232.

In *Anderson,* relied on by Defendants and by the Government on this issue, the Tenth Circuit concluded that an employee who entered his office on a holiday to view pornographic videos had standing to challenge a search of the room he used, even though it was not his personal work space, because he shut the door behind him, covered the windows and maintained possession of the tapes at all times. *Id.* at 1233.

Defendants claim that Hajduk has standing to challenge the searches because he regularly worked in the areas searched, he was in control of the premises and was present at least at the time of the February 11, 2002 search.

Applying this test to the facts here, I conclude that Hajduk does not have standing to challenge the searches of the sample box or of the manhole. The items seized in these searches were wastewater samples. It is unclear how Hajduk can claim personal ownership or control over these samples, or any particular relationship to them. These items were not in Hajduk's control when they were seized, they are not his personal property, and he made no effort to keep these items, or these areas, private.

The EPA search of the LW premises is more complex. The Government asserts that the bulk of the items seized were corporate records and thus Hajduk has no standing to challenge their seizure. Defendants claim summarily that Hajduk "regularly worked in the area searched, was in control of the premises and was present at the time of the search," but offer no additional facts. The list of items seized includes samples from several jars, two sections of pipe, and seven discreet documents, totaling 16 pages. Moreover, the search warrant indicates that the majority of these documents were seized from the "Operations Manager's" Room, presumably Hajduk's office. The Government does not appear to contest that Hajduk was present during this search.

Based on this very sparse record, I cannot conclude that Hajduk lacks standing to challenge the documents seized from his own office, when he was allegedly present.

### III. Motion for Franks Hearing

Defendants argue that the affidavits that were the basis of the EPA search warrants contain material false statements and omissions that were made recklessly or intentionally, and that therefore a *Franks* hearing is required to determine if the warrants lack probable cause. Defendants assert that the first search warrant is flawed because it is based on illegal

sampling by Persigo, because it is based on an affidavit from EPA Special Agent Robert Driscoll ("Driscoll") which contains false statements and omissions, and because it relies on false, misleading or imprecise information from Persigo employees. The alleged defects in the two search warrants are similar. Defendants assert that the second affidavit contains all of the flaws of the first affidavit, and is additionally flawed because it relied on the first unlawful EPA search and the alleged invalid Persigo searches conducted in February of 2002. I will therefore consider the issues Defendants raise about the warrants together.

### A. Standard for Franks Hearing

 An affiant in an arrest warrant may not make false statements "knowingly and intentionally" or "with reckless disregard for the truth." *Franks v. Delaware*, 438 U.S. 154, 155, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Such false statements violate the Fourth Amendment. *Id.* Where the defendant makes a "substantial preliminary showing" that the affiants made such flawed statements, and if these allegedly false statements are necessary to a finding of probable cause, the Fourth Amendment requires that the Court hold a hearing at the defendant's request. *Id.* at 156, 98 S.Ct. 2674. A defendant is similarly entitled to a *Franks* hearing if the affidavit relies on knowing or reckless omissions without which the warrant would lack probable cause. *Stewart v. Donges*, 915 F.2d 572, 582–583 (10th Cir.1990.) The burden is on defendant to make a substantial preliminary showing of false statements or omissions in the affidavit. *U.S. v. Corral–Corral*, 899 F.2d 927, 933 (10th Cir.1990.) Defendant, in order to make this preliminary showing, must provide an offer of proof supported by "affidavits or sworn or otherwise reliable statements of witnesses." *U.S. v. Smith*, 797 F.2d 836, 843 (10th Cir.1986.)

### B. Probable Cause for the Search Warrants

Defendants make several attacks on the EPA affidavits to support their argument for a *Franks* hearing. They argue that the Driscoll affidavit that was the basis for the warrants contains numerous false statements and omissions, that these statements were made recklessly or intentionally and relied upon illegal sampling and information from Persigo. Defendants contend that these portions of Driscoll's affidavit must be stricken, and that without these stricken portions probable cause to issue a search warrant is lacking.

I first address the issue of invalid sampling. Because I reject Defendants' arguments and conclude that Persigo's sampling was valid, I do not find this portion of the affidavit to be flawed.

Defendants also argue that the Driscoll affidavit consists of conclusory statements and statements of opinion by Persigo officials, and so cannot be the basis for probable cause. Defendants state that the affidavit recounts statements from Persigo employees stating that they believe that Defendants are tampering with the sample box and in other ways manipulating the flows of waste water to defeat or deceive regulatory oversight. Defendants point out that the statements in the affidavit are not definitive statements of fact by Persigo employees, but statements of opinion which are in some way conditional. For example, Driscoll recounts that Tonello stated he "believes ... the sampling unit was tampered with," (Driscoll Aff. ¶ 22), that Williams stated that unusual results from the sampling bottle made him "believe(s) that this is an indication of ... tampering," (Driscoll Aff. ¶ 24.) Williams saw on November 8 that the sampling bottle had been dumped out, so he "felt" that someone tampered with the bottle, and Williams' concludes that later specific

questioning by Hajduk about the mechanics of the purging of the bottle was "strong indication" that Hajduk had "tampered with the equipment." (Driscoll Aff. ¶ 25.)

 Defendants are correct that probable cause requires more than "mere suspicion." *U.S. v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir.2000). Probable cause requires "a nexus between suspected criminal activity and the place to be searched," and the affidavit in support of a search warrant must contain "facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." *Id.* Moreover, the reviewing court must afford the magistrate's probable cause decision "great deference," but not defer if there is not a "substantial basis for concluding that probable cause existed." *Id.* Probable cause must be justified on the "totality of the circumstances" in the affidavit, including the informant's "veracity and basis of knowledge." *Id.*

Applying this standard here, I have little difficulty upholding these portions of Driscoll's affidavit. Defendants make much of the "guarded language" used by Persigo officials. However, the affidavit recounts numerous instances of irregularities and disturbing instances regarding the sampling at Luxury Wheels. While it is possible that any one of these instances would be insufficient to justify probable cause, numerous instances over an extended period of time cannot be dismissed as coincidence or mere suspicion. Tonello stated that on three separate occasions sampling equipment had been filled to overflow, that he checked the equipment and it had not malfunctioned. (Driscoll Aff. ¶ 22.) Williams stated that this had never happened with this equipment at any other business. (Driscoll Aff. ¶ 24.) Williams also stated that Hajduk called asking questions about the purging process when written information was contained in the locked sample box, which had been apparently forced open. (Driscoll Aff. ¶ 25.)

Significantly, this information comes not from informants with a criminal history but from the City regulators responsible for oversight, sampling and compliance for the City's water treatment system. I find these statements to provide the necessary nexus between suspected criminal activity and the place to be searched and to be more than mere suspicion. For these statements, Defendants have failed to make the showing needed to justify a *Franks* hearing.

Defendants also assert that Driscoll falsely states that the City's easement allows Persigo to sample from the manholes, because the language of the easement "makes clear" that the easement is only for installation and maintenance of the manhole. Defendants contend also that the affidavit states falsely that the manhole was constructed to monitor effluent, which Driscoll knew or should have known was false.

This argument is flawed for several reasons. First, whether or not sampling from the manhole is covered by the easement is at the very least an open legal issue. As discussed above, my review of the easement and applicable law leads me to conclude that sampling is consistent with the easement language. Driscoll therefore cannot be engaged in false or reckless statements to suggest that the easement allows sampling. Second, the paragraph in the affidavit about the easement suggests that Driscoll was relying on Tonello's statement (Driscoll Aff. ¶ 33). Driscoll's good faith reliance on a statement by Tonello cannot qualify as reckless or false. Third, as discussed above, other provisions of the City Code require LW to construct a manhole, install sampling equipment and allow the City access to this sampling equipment. So even if the easement did

not allow access, since other City law allows access to the manhole for sampling purposes this mis-statement is not material and thus cannot vitiate probable cause.

Defendants also assert that the Driscoll affidavit improperly relied on the statements of former LW employee Robert Uriostequi, and improperly omitted or distorted Uriostequi's actual statements. Defendants argue that Uriostequi quit LW due to poor working conditions, thus suggesting he is a "disgruntled employee" with bias against LW. Defendants claim that Uriostequi had no prior experience in the plating industry and thus had no experience with which to judge the propriety of LW's acts. Defendants contend that Driscoll mis-stated that Uriostequi said that LW workers were asked to change their routine. Defendants assert that Uriostequi's information regarding two LW workers near to the sampling box is too vague to justify Driscoll's characterization of Uriostequi's statement that he saw two workers "manipulating" the box. None of these arguments persuade me of the need for a *Franks* hearing.

The mere fact that Uriostequi was a former employee does not bear on his credibility. Defendants' contention that Uriostequi may be biased because he said he left due to poor working conditions is conclusive, without foundation and insufficient to constitute a false or reckless omission. Similarly, Uriostequi's lack of experience in the plating industry does not bear on what he saw and about apparent attempts by LW workers to circumvent procedures necessary to comply with the permit and other applicable law. Driscoll does not overstate Uriostequi's information by paraphrasing it as "workers instructed to change their routine" when in fact Uriostequi stated that LW officials told workers to replace waste water with clean water so that the City would only sample clean water. The Driscoll affidavit accu-

rately summarizes Uriostequi's statement regarding management attempts to override the pH sensor to allow untreated waste to go to the POTW. Driscoll's report actually stated that Uriostequi said that "... there is an alarm that sounds when the pH is too low. Uriostequi observed the managers (Johnson and Hajduk) manipulating the sensors with chemicals to allow the filter press to be over-ridden. Uriostequi asserted that they allow untreated chemicals to pass through the pretreatment system." Taken in its entirety, the Driscoll affidavit fairly summarizes Uriostequi's statement to Driscoll. Defendants have not demonstrated that Driscoll has engaged in any false statements or material omissions.

Defendants have provided no persuasive basis for finding the Driscoll affidavit to be false and misleading, or for finding the first warrant to lack probable cause. I find and conclude that Defendants have failed to make the preliminary substantial showing necessary for a *Franks* hearing.

Defendants argue that the second affidavit contains all of the flaws of the first, but also unlawfully relied upon the results of the first search warrant and the Persigo sampling in February 2002. As discussed above, since I find these searches to be valid, reliance upon evidence from these searches is not improper.

Defendants further argue that Tonello falsely stated to Driscoll that the manhole sampling was justified under the LW permit. Again, as discussed above, this sampling is justified under the City Code, and the Permit states specifically that its provisions also incorporate relevant portions of the City Code. This statement is therefore not false.

Finally, defendants contend that Driscoll improperly relied on Tonello's statement that he believed that the green clay-like waste he observed in the manhole to be

from LW, since this statement is improper speculation and cannot justify probable cause. Because the manhole provides access to a pipe that leads from LW's facility to the public sewer line, I find this statement to be the reasonable judgment of a City regulator and not improper speculation. I therefore find and conclude that Defendants have failed to make the substantial preliminary showing that the second search warrant contains material omissions or false statements, and a *Franks* hearing is not justified.

## IV. CONCLUSION

I find and conclude that: 1) Luxury Wheels does not have a reasonable expectation of privacy in its wastewater headed irretrievably into a public sewer line and therefore the manhole search does not violate Defendants' Fourth Amendment rights; 2) the warrantless Persigo search of Luxury Wheels is justified because Luxury Wheels consented to these searches under applicable City law; 3) the Persigo search of the Manhole is justified under the City's easement of use; 4) Luxury Wheels is not a closely regulated industry so Persigo cannot use that doctrine to justify its warrantless administrative search of Luxury Wheels; 5) Persigo may not rely on the "open fields" doctrine to justify its search of the manhole and the sampling box; 6) the Persigo search does not constitute an improper use of City Administrative procedures to assist a federal criminal investigation; 7) Hajduk lacks standing to challenge the search of wastewater samples, but has standing to challenge the search of the documents seized from Luxury Wheels premises; and 8) Defendants have not shown that the Driscoll affidavits contain intentional or reckless false statements or material omissions to justify a *Franks* hearing.

Therefore, it is so ORDERED:

1. Defendant's motion to suppress is DENIED.

2. Defendant's motion for a *Franks* hearing is DENIED.